## DOWNING v. UNITED STATES (No. 431).[1]

PEARS' UNSCENTED SOAP A FANCY TOILET SOAP.

   Where there are irreconcilable differences in the testimony as to the use of the term "fancy soap" in commerce, it can not be said to have a commercial meaning that is definite, uniform, and general; but since the importation in question consists of cakes of soap, oval in form, translucent, attractive in appearance, agreeable in odor, and appealing to a fastidious taste, it is properly to be regarded as a fancy toilet soap, and was dutiable as such under paragraph 69, tariff act of 1897, and this regardless of whether or not it was perfumed.

United States Court of Customs Appeals, April 17, 1911.

APPEAL from a decision of the Board of United States General Appraisers, G. A. 7059
(T. D. 30761).

[Affirmed.]

   *Curie, Smith & Maxwell* (*W. Wickham Smith* of counsel) for appellants.
   *D. Frank Lloyd*, Assistant Attorney General (*Charles E. McNabb* on the brief), for the United States.

   Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

MARTIN, Judge, delivered the opinion of the court:
   On January 11, 1910, the appellants imported from England a consignment of Pears' unscented soap. The duty upon this importation

---

[1] Reported in T. D. 31530 (20 Treas. Dec., 816).

was prescribed by paragraph 69 of the act of 1909, which reads as follows:

69. Castile soap, one and one-fourth cents per pound; medicinal or medicated soaps, twenty cents per pound; fancy or perfumed toilet soaps, fifty per centum ad valorem; all other soaps not specially provided for in this section, twenty per centum ad valorem.

The collector held the soap to be a "fancy toilet soap," and therefore dutiable at 50 per cent ad valorem. The appellants protested against this assessment and contended that the soap was not a "fancy soap," and that neither was it a "perfumed toilet soap." They therefore maintained that it was dutiable at only 20 per cent ad valorem as a soap "not specially provided for" in the section.

The protest of appellants was heard upon evidence by the Board of General Appraisers, and the decision of the collector was affirmed by the Board. The appellants now present the record containing all the testimony, and also the exhibits, and pray for a reversal of these decisions.

It is conceded that Pears' unscented soap is a toilet soap. The question is whether it is also a fancy or perfumed toilet soap within the meaning of paragraph 69.

An examination of the record discloses the fact that both appellants and appellee undertook to prove to the board that the term "fancy" as it occurs in the paragraph was used not in its ordinary application, but rather as a trade term or commercial designation. The parties differed of course as to the signification which the trade had given to the term as its technical definition.

The appellants examined a number of expert witnesses upon this question. Each witness so examined by appellants testified specifically that Pears' unscented soap was not a fancy soap within the meaning of the term as established by the trade. The witnesses differed somewhat from one another as to the exact trade meaning of the term. However, with substantial unanimity they agreed that no soap would be called fancy by the trade unless it was wrapped in an ornamental wrapper and packed with only a few cakes in a box. The term fancy, according to these witnesses, had no application to the soap itself, but only to the manner in which it was wrapped and boxed. One exception to this use of the term was explained: If the soap had been cast into some fantastic form, such as a fruit or flower, or some other unusual figure, it would be called a fancy soap regardless of its quality. The appellants' witnesses agreed, however, that the quality and character of a soap would never entitle it to the trade designation "fancy," and that this term related wholly and entirely to its shape, wrapping and packing.

The Government also called a large number of witnesses upon this branch of the case. Each of these witnesses in turn testified specific-

ally that Pears' unscented soap was a fancy soap within the meaning fixed for that term by trade usage. The witnesses, in fact, agreed that all toilet soaps were called fancy soaps by the trade; they all denied specifically that the shape, wrapping or packing determined whether the soap was fancy or not. They maintained that the character of the soap itself alone determined whether it was a fancy soap or not, and that the name was generally given by the trade to all real toilet soaps. An uncertain borderland might be found in the case of such laundry soaps as had been so improved as to be sometimes used for toilet purposes, but such soaps as were distinctively toilet soaps were all, according to the Government's witnesses, fancy soaps.

The Government does not rest this branch of its case wholly upon this attempted proof, for it also contends that the appellants have failed to sustain their alleged definition of the term, and that if the word be given its common and ordinary signification it would nevertheless include such soap as this.

The first question presented by the record is whether the appellants have proven the alleged commercial definition of the word "fancy," upon which their case is so largely predicated.

The board found against this claim on the evidence. And a reading of the record and a comparison of it, part with part, leads to the conclusion that the tendered definition has not been sufficiently sustained by the evidence to entitle it to acceptance as a trade designation.

In construing a tariff act, when it is claimed that the commercial use of a word or phrase in it differs from the ordinary signification of such word or phrase, in order that the former prevail over the latter it must appear that the commercial designation is the result of established usage in commerce and trade, and that at the date of the passage of the act that usage was definite, uniform, and general, and not partial, local, or personal. Maddock v. Magone (152 U. S., 371).

The testimony introduced by the appellants to sustain the alleged usage is met by the Government with a larger volume of contradicting testimony from witnesses of apparently equal intelligence, equal opportunities of knowledge, and equal good faith. And while the testimony for the appellants seems on its surface to fully support their contention, if uncontradicted, there is nevertheless an undertone throughout it all which leaves one quite uncertain as to its convincing effect. Taking the testimony for the appellants alone, it can hardly be said to show that the alleged usage was well established, or was definite, uniform, and general.

The following questions and answers are taken from the cross-examination of some of the witnesses who were called by appellants. It is generally misleading to select detached excerpts from the tes-

timony of a witness and present them apart from their context; nevertheless these will not unfairly explain the meaning of the foregoing statement. These witnesses, it will be remembered, had all testified in chief in exact support of appellants' claim as to the trade meaning of "fancy."

Samuel A. Foot (p. 17):

Q. You have stated that the term "fancy soaps" is a well-understood trade expression as embracing a well-known class of goods?—A. Yes.

Q. Now, when do you use the word "fancy," if you use it at all?—A. I very seldom use it.

Q. Very seldom use it?—A. Yes, sir.

Q. Is it used in price lists at all as describing certain soaps?—A. More in cheap domestic goods. We will say goods that are known as five and ten cent sellers, than as imported goods.

\* \* \* \* \* \* \*

(Page 18:)

Q. You issue price lists, don't you—current lists?—A. Yes.

Q. And in those lists do you classify soaps with regard to their being perfumed or unscented or fancy?—A. Not in the list that we issue.

William K. Wardner (p. 26):

Q. Is the word "fancy" used in any way in business transactions, price current lists?—A. Except as to the packing, I have never seen it used in catalogues that I knew of. I would not say that it is not, but I don't recall it.

Q. Do you ever use it in placing orders or receiving orders?—A. No, no.

Q. Ever use it in correspondence?—A. No, sir.

Charles E. Cornell (p. 36):

Q. They use that term in their orders, do they?—A. Not very often; occasionally.

Q. Do you use it in pamphlets, circulars, or price lists?—A. Very rarely. It would be under the head of toilet soaps, classified so.

Albert J. Cramp (pp. 44, 45, 46, 47):

Q. Is the expression "fancy soaps" used at all in your catalogues?—A. No, sir.

Q. Prices current?—A. That is not in our catalogues.

Q. Do the people from whom you buy use the expression in their catalogues?—A. I don't think so.

Q. So that there are no soaps commonly listed under the expression "fancy soaps" as a class?—A. That has not come before my notice.

\* \* \* \* \* \* \*

Q. What is it, in your judgment, speaking now as a man experienced in the trade, that must necessarily be in a soap or connected with it to make it a fancy soap?—A. Well, the ingredients, for instance—the ingredients of a soap.

Q. Its composition?—A. Its composition.

Q. Will its composition control as against every other feature?—A. I think so.

\* \* \* \* \* \* \*

Q. Mr. Cramp, you testified in the answer to, I think, the first question of the counsel for the Government here that the question whether a soap was a fancy soap was determined by the character of the wrapper in which it was wrapped, and you have since testified, in answer to the question of the general appraiser, that the question of whether a soap was a fancy soap was determined either wholly or largely by its ingredients. Now, will you tell me which of those answers you wish to adhere to, or whether both of them, or whether you wish to withdraw one of them?—A. I would state that a fancy soap is judged principally by the wrapper that covers it.

Q. Well, now you say "principally." Is there something else that enters into the question of whether it is a fancy soap or not?—A. That finally determines it, I think.

Q. What; the wrapper?—A. The wrapper.

Alfred Kennedy (p. 50):

Q. Did the term "fancy soaps" have a well recognized and understood meaning as a trade term in the soap trade in 1909, August 5?—A. Not so much; no, sir.

E. A. Smith (p. 60):

Q. Is the word "plain" or "fancy" used in orders for soap?—A. No.

Q. Used in catalogues, price lists?—A. Well, that I could not answer. Not that I have ever seen.

Q. I mean, of course, those that came to you in your business.—A. No.

W. J. Quinby (p. 70):

Q. Your customers don't say fancy soap?—A. They say toilet soaps and generally say what price they want.

Q. Are those terms interchangeable, fancy and toilet?—A. It is not printed on catalogues or anything of that kind. We call all our soaps done up three cakes in a box fancy soaps.

Q. Is every toilet soap a fancy soap?—A. That I could not say.

As has been stated, each party called a large number of expert witnesses concerning the trade meaning of the words "fancy soap." The very fact that there is such hopeless confusion and irreconcilable difference between them argues against the existence of a commercial definition which was definite, uniform, and general.

It is easy to see how some confusion might arise on this subject. Ordinarily superior soaps would be wrapped in ornamental wrappers and packed with but few cakes in a box. This practice would aid in selling the soap at a price consistent with its quality. It might, therefore, come to be generally understood that a fine wrapper would indicate a fine cake of soap in it. In that sense a fancy wrapper might come to designate the character of the soap by acting as an assurance of its quality. The soap, however, and not the wrapper, would yet be the real determining factor. And the witnesses for appellants seem to be going too far when they say that the trade had finally come to look to the wrapper alone, and not at all to the character of the soap within, in their application of the term "fancy soaps." That is, they seem to be going too far when tested by the probability of their testimony, by their own explanations upon cross-examination, and by the opposing evidence of the large number of witnesses who directly contradict them.

All the expert witnesses seem from the record to be merchants and manufacturers of large experience, and from different parts of the country, and appear to be equally intelligent and sincere.

It being decided, then, that the term "fancy" had no such trade meaning as appellants contend, the next question is whether in its common and ordinary signification the term includes such soap as that in question. The board held that it did.

From the record and from the exhibits it appears that this soap is wrapped for the market in plain paper covers and is packed in ordinary

boxes, sometimes with many cakes in a box. But in quality the soap itself is evidently a superfine article. The cakes are oval in form, with concave sides, and are attractive in appearance. They are convenient in size for toilet use. They are handsomely colored, the cakes being also translucent. The soap is not merely neutral in respect to odor, but instead possesses a very delicate and pleasing fragrance. It is palpably an article which is not merely useful as a cleansing agency in the bath, but in addition to this quality of usefulness it possesses other qualities designed to make it pleasing to the senses. Because of the materials composing it, or the process of manufacture, or both, it is an article which appeals to the fancy; it is characterized by refinement of finish; it is ornamental in qualities rather than plain; it gratifies a refined and cultivated taste; and satisfies the demands of the fastidious. This is an added quality, and is a step in advance of merely common practical usefulness. The record shows that these qualities result, in part at least, from processes in manufacture which are not essential to the making of a toilet soap useful for mere cleansing purposes. Alcohol is used for the sole purpose of producing the distinctive clearness of the soap which adds so much to its appearance. Other ingredients are used for the sole purpose of giving the soap its fragrance.

In common parlance such a soap would ordinarily be called a fancy soap, regardless of its wrapping and packing. And there seems to be no reason why this meaning should not be given the word as used in paragraph 69. The soap was therefore dutiable at 50 per cent ad valorem as a fancy soap. Such a conclusion does not imply that the term in question is not broad enough to include also such other soaps as are made especially attractive by reason of their unusual forms; nor does it imply that all toilet soaps would. necessarily be classified as fancy soaps.

In view of this conclusion, the question whether the soap is also a perfumed toilet soap is not important in this case. There was a careful examination made into this question by the parties, as appears by the record. A great deal of conflicting testimony was submitted to the board upon that issue. It may be noted, however, that the original assessment by the collector of 50 per cent ad valorem, following T. D. 30113, was placed upon the sole ground that the soap was a fancy toilet soap and not upon the ground that it was a perfumed one. The Board of General Appraisers did not base their decision upon the theory that the soap was a perfumed soap, nor is this decision predicated upon such a finding.

The decision of the board is *affirmed.*

MONTGOMERY, Presiding Judge, and SMITH, BARBER, and DE VRIES, Judges, concur.