## UNITED STATES *v.* FIELD & CO. (No. 2044).[1]

1. CONSTRUCTION—DOUBT FAVORS IMPORTER.
   In cases of doubtful interpretation of a statute the benefit of the doubt must be given to the importer.

2. CONSTRUCTION, PARAGRAPH 358, TARIFF ACT OF 1913—"EMBROIDERIES."
   To constitute an embroidery (par. 358, tariff act of 1913) there must be, by needlework processes, an ornamental addition superimposed upon a previously completed fabric or article—not a needlework ornamentation placed upon a fabric regarded as a material only, which ornamentation constitutes substantially the completed fabric or article.

3. COMMERCIAL DESIGNATION.
   It is incumbent upon a party claiming commercial designation to show that the merchandise was, in the wholesale trade and commerce dealing therewith in this country, at the date of the passage of the act, definitely, uniformly, and generally known as claimed. The rule is not satisfied if it appears that such claimed designation was only partial, local, or personal.

4. CONSTRUCTION, PARAGRAPHS 288 AND 358, TARIFF ACT OF 1913—MANUFACTURES OF WOOL—TAPESTRY—EMBROIDERY.
   The merchandise at bar consists of woven flax canvases and colored woolen yarns, the canvases having been stitched by hand with the yarns sufficiently to indicate a preconceived ornamental design and color scheme and the nature of the needlework, and enough of the yarns being imported with the canvases to complete the work. When finished, they are to be used on the seats or backs of pieces of furniture, the component material of chief value will be wool, and the canvases will be substantially, if not entirely, covered by the ornamental designs. A distinction should be made between an article or fabric entirely finished, so far as its ultimate uses are concerned, like wearing apparel, handkerchiefs, tablecloths, or other fabrics or articles which are ready for use and capable of performing the function for which they are made, whether embroidered or not, and the tapestry canvas which is the basic fabric of this merchandise. The importations are not finished articles, but materials. When finished the merchandise will be tapestry in common understanding, though, perhaps, not true tapestry. It is classifiable under paragraph 288, tariff act of 1913, as manufactures of wool, and not under paragraph 358 as embroideries or embroidered articles.

[1] T. D. 38550 (38 Treas. Dec., 749).

5. Construction, Legislative Sanction.

. ' Congress is presumed to have enacted the provision for embroideries, paragraph 358, tariff act of 1913, in harmony with the judicial interpretation of the word obtaining at that time.

## United States Court of Customs Appeals, November 23, 1920.

Appeal from Board of United States General Appraisers, G. A. 8343 (T. D. 38415)

[Affirmed.]

*Bert Hanson*, Assistant Attorney General (*Martin T. Baldwin*, special attorney, of counsel), for the United States.
*Crim & Wemple* for appellees.

[Oral argument Oct. 26, 1920, by Mr. Baldwin.]

Before Smith, Barber, De Vries, and Martin, Judges.

Barber, Judge, delivered the opinion of the court:

In Sloane *v.* United States (7 Ct. Cust. Appls. 463; T. D. 37049) we considered the proper classification of certain fabrics and held the same to be within the provision for "all manufactures of every description made, by any process, wholly or in chief value of wool, not specially provided for," in paragraph 288 of the tariff act of 1913.

The merchandise had been classified by the collector under paragraph 358 of the same act under the provision for "embroideries" or "articles or fabrics embroidered in any manner by hand or machinery * * * by whatever name known." This classification had been upheld by the Board of General Appraisers. It was contended for by the Government here but refused.

The importations covered by the several protests in the case now before us are the same as those involved in the Sloane case, with the exception that there the articles were finished. Here they are unfinished, but, nevertheless, sufficiently completed, it is conceded, to raise the identical question passed upon in that case. The Government here contends that in the Sloane case the court was misled by the insufficiency of the record, and that upon the present record the collector's classification should be sustained.

The typical official exhibit in this case is an unfinished textile fabric intended to be used on the seats or backs of pieces of furniture. It is produced by stitching by hand ornamental designs in colored wool yarns on a basic fabric or background of woven linen canvas. As already indicated, the difference between the exhibits in this and the Sloane case is that there the goods were finished; here the ornamental stitching has proceeded only far enough to show the design and the color scheme that is to appear in the articles when completed. Small portions of the surface have been finished in order to illustrate the nature of the needlework. With each piece of this linen canvas

is imported a sufficient quantity of yarn of the proper colors to finish the article, and wool is the component material of chief value of each importation.

In the Sloane case we concluded that the merchandise was a form of tapestry, and not embroidery, and therefore that its assessment was incorrect. In that case the issue was fully discussed by counsel for both the Government and importer. Importers here present no brief and make no argument, relying, it is presumed, upon the authority of the Sloane case. In the instant case the Board of General Appraisers, although evidently convinced that the merchandise should be classified as embroideries or embroidered articles, felt constrained, by our decision in the Sloane case, to classify the merchandise under paragraph 288 as a manufacture wholly or in chief value of wool not specially provided for.

The Government contends:

1. That the merchandise is embroidered, independent of commercial designation.

2. That in commercial understanding it is regarded as an embroidery or an embroidered article.

If the second contention is supported by the record we think our judgment should be for the Government, and therefore first consider that phase of the case.

This issue was not raised in the Sloane case. Here the Board of General Appraisers disposed of that question by saying, in substance, that the evidence of commercial designation tended to show that the merchandise was known in the wholesale trade and commerce of this country as embroidered articles or embroideries, but did not conclude, so far as shown by its opinion, that this claim was established.

Commercial designation is a fact to be established by a fair balance of the testimony, and the burden of proof is upon the party making the claim. Therefore in this case the burden is upon the Government to show that this merchandise was, in the wholesale trade and commerce dealing therewith in this country, at the date of the passage of the act, definitely, uniformly, and generally known as embroideries, or an article or fabric embroidered. Maddock *v.* Magone (152 U. S. 368). Downing *v.* United States (1 Ct. Cust. Appls. 500; T. D. 31530). United States *v.* Goldberg (3 Ct. Cust. Appls. 282; T. D. 32573).

The rule is not satisfied if it appears that such claimed commercial designation was only partial, local, or personal. We think it is unnecessary to recite the evidence tending to support the claim of commercial designation further than to say that five or six witnesses testified upon that point that the merchandise was in the wholesale trade known as embroidery or as embroidered articles.

One, however, expressly stated that his knowledge was based upon local dealings with one firm in New York; another, prior to the enactment of the present tariff act, had had only one or two wholesale transactions involving merchandise similar to this; another, while saying the wholesale trade regarded merchandise like this as embroidery, referred to it also as likewise regarded as canvas tapestry embroidery, or a hand-embroidered canvas tapestry; another, that he would call a tapestry an embroidery; and another, that these importations were known, amongst other things, as needlework tapestries.

Some of these witnesses gave expert testimony as to the methods of production, and substantially all indorsed the view that whether an article was tapestry or embroidery depended entirely upon its method of production; that unless it was a woven fabric—that is, woven in a loom, generally by hand—it could not be a tapestry.

A careful reading of the record satisfies us that the testimony given as to commercial designation by these witnesses was so far influenced, unconsciously no doubt, by their belief that in fact tapestry must always be woven, and was also so indefinite as to the trade usage, that we do not think it establishes, by a fair balance of evidence, that the merchandise here was, at the date of the passage of the act, definitely, uniformly, and generally known as embroideries or as articles or fabrics embroidered.

We pass, therefore, to the consideration as to whether or not these importations are, within the common meaning of the terms as employed in paragraph 358, either embroideries or articles or fabrics embroidered in any manner.

As the Government points out, tapestry was first produced upon looms, and in such production there was not, as is the case with the official exhibit here, a foundation fabric designed to be completed by ornamental needlework placed thereon.

In the development of the art of tapestry making, as was pointed out in the Sloane case, it was found that an open weave of canvas, or other material, could be used, and that ornamental needlework applied thereto resulted in the production of something very like, in its appearance, the loom-woven tapestry, and to such extent was this carried that one of the most famous tapestries of history, the Bayeux tapestry, was in the eleventh century made in this manner. Doubtless it was in fact, as is testified here, in imitation of the tapestry that had theretofore been produced, and probably was known to some as needlework tapestry, or, as the Government styles it in its brief, quoting from one of the authorities, a petit point or needle tapestry; but the fact remains, we think, that during all the centuries when much time and many artists were employed in its manufacture, it was known as tapestry.

We have found no more enlightening discussion of this subject than that given in Thomson on "Tapestry Weaving in England," published in 1914, as follows:

· There is a great deal of ambiguity at the present day as to what is meant by the word "tapestry." This has arisen from employing it to describe any fabric used as drapery for walls, curtains, cushions, coverings for furniture, or other purposes; and also embroideries, damasks, velvets, silks, painted or printed textiles, and reps have all been included in the liberal use of the word    There is really no serious error in this, it is only using the word "tapestry" as descriptive of the function the material fulfils, not of the nature of the material itself; but in the interests of clearness it is imperative to limit the application of the term

That limit is to be found in the *structure* of the material.

In this strict sense "tapestry" should be used only to describe a hand-woven material of ribbed surface. resembling rep, but into which the design is woven during manufacture, so that it forms an integral part of the textile.

This may be woven on an upright loom, or upon a horizontal loom in which treadles play an important part, but the resulting fabric is the same

Indeed, Mr Hunter, one of the Government's witnesses, expresses in substance the same view in a textbook of which he is the author, entitled "Tapestries—Their Origin, History, and Renaissance," published in 1912, wherein he refers to the Bayeux tapestry, evidently recognizing that it had been regarded as a tapestry for centuries, although at the same time he declares it is not a tapestry at all, but an embroidery. As indicating his view on the whole subject, we quote from page 238 of his book:

Tapestry is a broad word. It means one thing in a wall-paper shop and another in a carpet and rug store; one thing among makers of painted tapestry and another among makers of embroidered tapestry; one thing among jacquard and power and shuttle weavers, another among manipulators of high-warp and low-warp looms. There are also printed imitations of arras tapestries

By general consent and established usage, the term *real tapestry* is reserved for high-warp and low-warp products    But until now general consent and established usage have not put into print a clear and comprehensive statement of how high-warp and low-warp tapestries differ from other textiles and from each other

This quotation is followed by a description of the looms upon which real tapestry was made.

In Posselt's "Technology of Textile Design," at page 256, it is said that "tapestry is neither real weaving nor true embroidery." And, again, that "Older kinds of tapestries, for example, the well-known Bayeux tapestry, were wrought by the needle on the surface of the cloth and thus are actually produced by embroidering."

In the Encyclopedia Britannica, volume XXVI, page 403, it is said that the Greek and Latin words from which "our word tapestry is descended implied a covering to both furniture and floors, as well as curtains or wall hangings, and neither of them really defines the particular way in which such articles were made." The discussion following the definition seems to regard as tapestry both the loom-woven articles and those produced in manner similar to Exhibit I.

In "The Tapestry Book" by Helen Churchill Candee, published in 1912, beginning at page 241, a chapter is devoted to the Bayeux tapestry, although the author emphatically says that it is not in fact tapestry at all, but the most interesting embroidery of Europe. She says, however, in the same chapter that "in English, tapestry may mean almost any decorative stuff."

It is of interest, in passing, to note that this Bayeux tapestry was a strip of Holland brown, heavy linen cloth, about 231 feet long and 19 inches in width, embroidered in colored wools.

In an article of R. R. Treganza on "Arts and Decorations," 1913–14, page 24, it is said:

> The present revival of that ancient and picturesque form of wool embroidery used for furniture coverings and other decorative purposes, and called variously petit point * * * needle tapestry * * * is one of the many interesting and promising signs of the day. The history of these miniature pieces of tapestry is worthy of attention

And in the article many original needlework tapestries are referred to as preserved in museums and historic mansions.

In a work upon "Embroidery or the Craft of the Needle," published in 1899, at page 202, Italian products, known as "Bargello work," said to be "the name given a form of tapestry—a solid kind of embroidery," are referred to. This apparently was made in the seventeenth century.

These references are all taken from authorities cited by the Government, and are for the purpose of illustrating the point that the word "tapestry" in the common parlance has for centuries been considered to include finished articles produced in the same manner as the merchandise now before us.

The definitions given of the word "tapestries" in various dictionaries to-day, which it is unnecessary to repeat, indicate that in the common understanding that word now includes articles similar to Exhibit I. Indeed, as stated by Thomson in the quotation above given, "there is really no serious error in this; it is only using the word 'tapestry' as descriptive of the function the material fulfills."

We doubt if at this late day any effort to fix a line of demarcation between tapestries made upon a loom and those made by needlework upon a foundation fabric, so that the former only can be regarded as tapestry, should control the ordinary meaning of the word "tapestries" adopted and used for centuries. For the purposes of certainty in scientific or artistic discussion of the subject, no objection may be made to that attempt, but the statute uses words in their common, ordinary meaning.

But the Government lays great stress upon the fact, which must be admitted, that the merchandise before us is the result of needle-

work applied to an existing fabric, arguing therefrom that it is embroidery in fact, or in fact embroidered.

What constitutes embroidery or an embroidered article in customs law has been the subject of much litigation, to review all of which would extend this opinion to an unreasonable length.

In T. D. 28170 (G. A. 6589) the subject was fully considered, and in the dissenting opinion of De Vries, then General Appraiser, the authorities were exhaustively reviewed. The precise issue was not that now before us, but in the dissenting opinion the conclusion was reached that embroidery was ornamental needlework applied to an *already existing and completed fabric* for the purpose of producing thereon ornamentation.

It seems that this case was not reviewed by the courts. However, in T. D. 26853 (G. A. 6205), involving a protest of Waentig, views later set forth in the dissenting opinion in T. D. 28170 had been expressed by the Board of General Appraisers. Among the definitions of embroidery referred to in the board's opinion was one from the New International Encyclopedia defining embroidery as—

The art of producing by means of needle and thread, ornamental designs upon cloth or other fabrics. The term "embroidery" is always applied to a completed fabric; and the art is thus distinguished from the kindred arts of tapestry and lace making, in which the ornament is part of the structure of the material.

This case was reviewed in circuit court (168 Fed., 570). In its opinion the court used the following language:

The fundamental idea of embroidery seems to be that it is needlework done upon a previously completed fabric, as distinguished from tapestry or lacework, in which the design is a part of the original fabric, and the idea that it shall be ornamental also seems to be essential to the definition.

The above encyclopedia definition was before, and seems to have been adopted by, the court. Upon review in the Circuit Court of Appeals the judgment of the circuit court was affirmed without opinion (174 Fed., 1023).

The Government strenuously argues that the basic fabric upon which the needlework here is done should be regarded as the existing and completed fabric to which embroidery is applied.

In the case before us, as in the Sloane case, it is shown that the tapestry canvas in this case will, when the hand stitching thereon is completed, be substantially, if not entirely, covered, and it is obvious that when so completed the importation here, as in the Sloane case, will be an entire fabric, upon the surface of which the preconceived design will appear, just as it does in tapestry woven on a loom; and it is also obvious that the completed work will in fact be very like the woven article, and will serve the same function, just as did the Bayeux and other tapestries of centuries before.

We think a distinction should be made between an article or fabric entirely finished, so far as its ultimate uses are concerned, like wearing apparel, handkerchiefs, tablecloths, or other fabrics or articles which are ready for use and capable of performing the function for which they were made, whether embroidered or not, and the tapestry canvas which is the basic canvas in this case. This foundation canvas is but one of the materials used in producing the finished article, and with it are imported the woolen yarns of quantity and color required to complete the article itself. It is not usable, and is not used in its original condition, for any of the purposes to which it will be appropriated when it is completed by the addition of needlework, and for those purposes it is not a finished article until the needlework has been applied thereto. In other words, it is but material with which other materials are combined to produce a finished product. It is clearly set apart and appropriated to use as material; and the stitching that is applied thereto is for the purpose of producing, and does produce, a finished article which, in the common understanding, is tapestry, and in fact serves the function of so-called true tapestry.

It is not contended—indeed, the contrary view is tacitly adopted by the Government—that true tapestry would be dutiable under paragraph 358. Moreover, the language of that paragraph seems to indicate that the ornamental process of embroidery therein provided for is to be applied to an article or fabric ready for use, and not to one regarded as material only for the production of something altogether different from the article or fabric itself.

To illustrate, wearing apparel, handkerchiefs, cloth of any kind, are still the same things after superimposed ornamentation is proproduced thereon by embroidery as they were before. They have not lost their original identity, but have been made more beautiful; while the foundation fabric of Exhibit I in this case, when finished by the needlework, has become a different article altogether from what it was in its first estate; and although in one sense it may be spoken of as embroidered or an embroidered article, we think it is, nevertheless, for tariff purposes, not that, but is classifiable under paragraph 288 as claimed by importers.

Congress is presumed to have enacted paragraph 358 in contemplation of the meaning given to the word "embroidery" in the Waentig case. Therefrom we think it is clearly inferable that to constitute an embroidery there must be by needlework processes an ornamental addition superimposed upon a previously completed fabric or article, not, as in this case, a needlework ornamentation placed upon a fabric regarded as a material only, which ornamentation constitutes substantially the completed fabric or article.

In passing, we observe, that we have not knowledge as to the administrative custom in assessing merchandise of this kind.

There may be doubt as to the conclusion which should be reached in this case, but upon the record here, and in view of the decision in the Sloane case, having in mind also the rule that in cases of doubtful interpretation of a statute the benefit of the doubt must be given to the importer, we think the judgment below ought to be, and it is hereby, *affirmed.*