Slip Op. 03 - 100

UNITED STATES COURT OF INTERNATIONAL TRADE

- - - - - - - - - - - - - - - - - - - -x

WASHINGTON INTERNATIONAL INSURANCE CO.,:

                        Plaintiff,    :
                                            Consolidated
              v.                      :     Court No. 92-04-00252

                                      :

UNITED STATES,
                                      :
                        Defendant.
                                      :
- - - - - - - - - - - - - - - - - - - -x


                    Memorandum


[Upon stipulation of the facts in lieu
 of trial regarding steel imports,
 judgment for the defendant.]

                              Decided: August 8, 2003


        Sandler, Travis & Rosenberg, P.A. (Beth C. Ring) for the
plaintiff.

        Peter D. Keisler, Assistant Attorney General; John J. Mahon,
Acting Attorney in Charge, International Trade Field Office,
Commercial Litigation Branch, Civil Division, U.S. Department of
Justice (Aimee Lee); and Office of Assistant Chief Counsel, Inter-
national Trade Litigation, U.S. Bureau of Customs and Border
Protection (Chi S. Choy), of counsel, for the defendant.


        AQUILINO, Judge:  This action consolidates claims by the

plaintiff for refunds of duties assessed by the U.S. Customs

Service on the full value of imports of stainless steel, as opposed

to only on the value of its processing outside the United States

per item 806.30 of the Tariff Schedules of the United States

("TSUS"), which duty exemption applied to

[a]ny article of metal (except precious metal) manufac-
tured in the United States or subjected to a process of
manufacture in the United States, if exported for further
processing, and if the exported article as processed
outside the United States, or the article which results
from processing outside of the United States, is returned
to the United States for further processing[.]

I

To be "manufactured in the United States", there "must be transformation; a new and different article must emerge, 'having a distinctive name, character, or use.'" Anheuser-Busch Brewing Ass'n v. United States, 207 U.S. 556, 562 (1908). An article may be "subjected to successive processes of manufacture, each one of which is complete in itself, but several of which may be required to make the final product." Tide Water Oil Co. v. United States, 171 U.S. 210, 216 (1898). A "process of manufacture" advances an article in condition or value such that the article is more than it was in its original state. See, e.g., United States v. Oxford Int'l Corp., 62 CCPA 102, 106, 517 F.2d 1374, 1377-78 (1975); United States v. Flex Track Equip. Ltd., 59 CCPA 97, 101, 458 F.2d 148, 151-52 (1972); Ford Motor Co. v. United States, 19 CCPA 69, 71, T.D. 44897 (1931). It is well-established, though, that certain processes are not manufacturing. See, e.g., Lackawanna Steel Co. v. United States, 10 Ct.Cust.Appls. 93, 94-95, T.D. 38359 (1920) (crushing rock such that it was "rendered into the imported sizes solely to facilitate and economize in transportation" not a manufacturing process); Firestone Tire & Rubber Co. v. United States, 71 Cust.Ct. 63, 66, C.D. 4474, 364 F.Supp. 1394, 1397

(1973) ("mere cleansing of an article, or 'getting it by itself',
[] not a manufacturing process"). Morever, "[e]very application of
labor is not a manufacturing process[,] and it has long been held
that an operation which is necessary to get an article of commerce
by itself is not such a process." George Beurhaus Co. v. United
States, 32 Cust.Ct. 269, 271, C.D. 1612 (1954), citing United
States v. Sheldon & Co., 2 Ct.Cust.Appls. 485, T.D. 32245 (1912);
Cone & Co. v. United States, 14 Ct.Cust.Appls. 133, T.D. 41672
(1926); United States v. U.S. Rubber Co., 31 CCPA 174, C.A.D. 269
(1944); V.W. Davis v. United States, 10 Cust.Ct. 189, C.D. 751
(1943); J.E. Bernard & Co. v. United States, 30 Cust.Ct. 122, C.D.
1509 (1953). In Beurhaus, for example, pumpkin seed kernels were
held to have been imported unmanufactured where their foreign
processing consisted of removing the kernels from whole seeds and
drying them out:

> . . . Defendant claims that the imported merchandise has
> been partially manufactured because shelling or peeling
> the seeds was one of the steps necessary to the develop-
> ment of the finished article. It might likewise be
> claimed that removing the seeds from the pumpkin and
> taking the pumpkin from the vine were such steps. All of
> those operations were, of course, necessary to the pro-
> duction of the finished article, but they were primarily
> required for the purpose of obtaining the seed kernels
> free from the pods.

32 Cust.Ct. at 271. Similarly, in United States v. Salomon, 1
Ct.Cust.Appls. 246, 249, T.D. 31277 (1911), the court held that
cotton waste, which had been treated and bleached, was not "advanc-
ed in value by a[] . . . manufacturing process".

II

In the light of this law long settled, come the parties
to this action with a Stipulation of Material Facts in Lieu of
Trial, which the court has reviewed and approved as having "be[en]
submitted for decision in lieu of trial on" its contents.[1]  They
include the following:

> 4.   Plaintiff . . . is the surety on the customs
> bonds for the entries subject to this action.
>
> 5.   The importer of record on the subject entries
> during the relevant time period[] was either Newmet
> Corporation or Newmet Steel Corporation (collectively
> referred to as "Newmet").  . . .
>
> 6.  Newmet was engaged in the business of selling in
> the United States[] finished or semi-finished stainless
> and electrical steel products which were purchased from
> foreign steel mills on a scrap conversion basis, meaning
> that Newmet supplied scrap to the foreign steel mills and
> paid them for converting the scrap into the imported
> stainless steel sheets, plates and strips.
>
> 7. Newmet obtained orders for the imported semi-
> finished or finished stainless steel sheets, plates or
> strips from steel fabricators in the United States, which
> such fabricators would further process by straightening,
> slitting and cutting to size for further sale to manufac-
> turers of a variety of stainless steel products.
>
> *   *   *
>
> 9.   The imported merchandise consists of stainless
> steel sheets, plates and strips and are articles of metal
> other than precious metal.

---

[1] The court's jurisdiction over this consolidated action is
pursuant to 28 U.S.C. §§ 1581(a), 2631(a).

In addition to their stipulation, the plaintiff has filed a
motion for summary judgment, and the defendant has countered with
a motion for judgment upon the stipulation.

10. The merchandise covered by the subject entries . . . [was] processed abroad by foreign steel mills from stainless steel scrap that had been exported from the United States.

11. The exported scrap (hereinafter also referred to, for purposes of this stipulation, as "prepared scrap")[] was the raw material from which the imported products were manufactured . . . by the foreign steel mills.

12. The subject imported stainless steel sheets, plates and strips were imported into the United States for further processing into various stainless steel products.

13. The subject entries were liquidated with duty assessed on the full value of the imported merchandise.

* * *

15. The "scrap" as it enters the . . . yard (hereinafter also referred to as "incoming scrap") was not solely of U.S. origin but consisted of scrap of U.S. and foreign origin that were commingled.

* * *

17. The Customs Service issued 2 rulings in connection with this matter: HQ 555096, July 7, 1989 and HQ 555557, April 15, 1991, which are attached to this stipulation.

* * *

19. The scrap yards dealt with two types of scrap: "obsolete" and "industrial" . . ..

20. "Obsolete" scrap, also known as "old solids," consist of metal machinery that is no longer usable.

21. "Industrial" scrap is comprised of two types: (i) "turnings," and (ii) "new solids". "Turnings" are small pieces of metal, approximately 1 inch in size or smaller and less than 1/8 inch thick, that result from milling bars of stainless steel into the correct size, such as in the manufacture of screwdrivers or screws. About 10 percent of the incoming scrap consisted of

turnings.    "New solids" are the discarded trimmings
resulting from the process of manufacturing articles and
components from stainless steel sheets and bars.

*   *   *

23.   The scrap yards generally perform three
categories of operations on the incoming scrap: (i)
testing and segregating; (ii) sizing; and (iii) packag-
ing.

24.   Testing and segregating consisted of identify-
ing the alloy metal content of the incoming scrap and
segregating it into containers based on its chemical
composition.  All incoming scrap was tested with a magnet
after being unloaded from rail cars onto a conveyer belt
with hydraulic or rail cranes.  . . . The incoming scrap
was then spark tested by placing the scrap against a
grinding wheel to produce a spark.  The color of the
spark identified the metal.  Where those tests did not
definitively identify the chemical composition, further
testing was performed by placing acid on the scrap or on
grindings resulting from drilling a hole in the metal.
. . .

These tests would be sufficient to identify about 90
percent of the incoming scrap.  For the remaining 10 per-
cent . . ., the scrap yards had laboratories equipped
with x-ray spectrometers and atomic absorption analyzers
to test tiny pieces of scrap called grindings obtained
from drilling a hole in the scrap.  . . .

Large and irregularly-shaped incoming scrap was
compacted or crushed before being tested, which allowed
for a composite piece . . . for testing.  Incoming scrap
was sometimes decontaminated or upgraded.  Decontam-
ination was the process of cleaning and cutting out sec-
tions of non-alloy material from the scrap metal and was
performed by cutting with an automatic torch or an
abrasive saw.  Upgrading was the separating out of non-
stainless steel material from mixed shipments of stain-
less and non-stainless steel scrap received by the . . .
yards.  . . .

After the . . . alloy content was identified the
scrap was sorted into containers corresponding to its
grade.  There were hundreds of grades . . ..

25.  Sizing was the operation of cutting scrap to a size that would fit in the steel mill's furnaces and depended upon the shape and size of each individual piece of scrap.  Sizing includes cutting, crushing, ripping, shearing or shredding. . .. Cutting refers to the cutting of scrap into smaller pieces using an automatic torch. Ripping, which was rarely needed, is the term used to separate stainless steel from non-stainless material. Shearing is the cutting of long strips of scrap into smaller pieces using alligator or heavy shears.  Shred-ding is the cutting of scrap in a shredder into small thin pieces and was occasionally performed on special kinds of incoming scrap.  Larger pieces of scrap were put through a crusher to break up big pieces of castings which could not be cut by other methods and could also be subject to another method of cutting, such as shearing and/or cutting, depending upon . . . size.  . . .

26.  Packaging was the weighing and accumulating of truck loads or railcar loads of a specific grade of solids or a sufficient amount of briquettes or bales of turnings to comprise a railcar load or truck load, to fill a customer order.  Briquetting is the forcing, by using a briquetting machine, of turnings and small solids into blocks no larger than 3 ft. by 5 ft. by 2 ft. for ease of transport and utilization in the customer's fur-nace.  Baling is performed by compressing very thin scrap into small square sized packs for the convenience of handling, transporting and furnace size.

* * *

29.  The truck loads and railcar loads of prepared scrap were then exported to foreign steel mills in order to be processed into stainless steel sheets, plates, and strips.

The parties further agree in paragraph 14 of this stipulation that the crux of their controversy is whether or not the merchandise was "manufactured in the United States or subjected to a process of manufacture in the United States" within the meaning of TSUS item 806.30, supra, and that "[a]ll other conditions of [that] item . . . are met."

                                        A

        The imports underlying this action, as described in their
entry papers and also in the foregoing stipulation, were stainless
steel sheets, plates, and strips produced overseas.  And those pro-
ducts were "manufactured" there within any definition of that term.
That is, plaintiff's exported pieces of metal underwent transforma-
tion, resulting in new and different articles, having distinctive
names, characters or uses of the kind contemplated by Anheuser-
Busch, supra, and other cases.  Nothing which occurred in the
United States prior thereto, as stipulated above by the parties,
amounted to such manufacture.

        The plaintiff does not argue otherwise, but it does
contend that the afore-described preparation of the scrap for
shipment for that foreign transformation was itself manufacture --
in this country.  Its briefs characterize the incoming metal as
"junk"[2], perhaps in the hope that this court could and therefore
would divine transformation into scrap.  The court cannot do so on
the evidence adduced, although at least some sources of that metal
surely could satisfy someone's definition of junk[3].  But that def-
inition would not necessarily differ materially from that for
scrap[4].  Whichever definition, the substance of interest which en-

_____

        [2] Memorandum in Support of Plaintiff's Motion for Summary
Judgment [hereinafter "Plaintiff's Memorandum"], pp. 1, 2, 7, 12,
15;  Plaintiff's Memorandum in Reply, pp. 2, 7, 15, 19.

        [3] See, e.g., Webster's Third New International Dictionary of
the English Language Unabridged, pp. 1226-27 (1981).

        [4] Compare, e.g., id. with id. at 2039.

tered the Newmet yard(s) remained that substance upon exit for export, including some originally from other lands.  In short, the court is unable to conclude that Newmet's preparation of the articles of metal for export was "manufacture[] in the United States" in satisfaction of the statutory standard to support, if not save, dissipating U.S. industry.

This action thus comes down to consideration of whether that preparation subjected those articles to a "process of manufacture in the United States".  On this issue, the plaintiff argues that,

> in enacting item 806.30, TSUS, Congress did not intend the phrases "manufactured in the United States" and "subject to a process of manufacture in the United States" to mean the same.  A contrary conclusion would render the words of the statute superfluous, a result the courts seek to avoid.[5]

This court concurs.  And the plaintiff also points out that

> "Congress used the expression 'subjected to a process of manufacture' as synonymous with processing."  . . . "Processing generally connotes an advancement of the material or article, as distinguished from manufacturing which is broader in scope," said the Customs Service in Headquarters Ruling 055038 dated June 16, 1978.  Thus, less has to be done to "process" an article than to "manufacture" one.[6]

---

[5] Plaintiff's Memorandum, p. 11, citing Carey & Skinner, Inc. v. United States, 42 CCPA 86, C.A.D. 576 (1954).

[6] Plaintiff's Memorandum, pp. 11-12, erroneously attributing in toto the first quoted sentence to A.F. Burstrom v. United States, 44 CCPA 27, [31,] C.A.D. 631 (1956).

Cited by counsel for the last proposition is <u>Firestone Tire &</u>
<u>Rubber Co. v. United States</u>, <u>supra</u>, which does indeed support it.
In that case, metal top and bottom domes for liquid containers were
manufactured in the United States and then sent to Canada for
coating with rubber before return to this country.  The court held
that application to be "further processing" under TSUS item 806.30,
overruling the contrary view of Customs, which had resulted in
imposition of duties on the full appraised value of the returned,
rubberized, metal domes.  That view of the government was that,

> to come within the purview of item 806.30, TSUS, some
> process of manufacture comparable to machining, grinding,
> drilling, tapping, threading, punching, or forming must
> be performed on the metal itself.  Defendant urges that
> these enumerated operations were the types of "further
> processing" contemplated by Congress in item 806.30, and
> that the rubber coating operation performed by Uniroyal
> in Canada was not comparable to any of the above enumer-
> ated operations.

71 Cust.Ct. at 66, 364 F.Supp. at 1397.  The court concluded that
Congress had not intended this "highly restrictive interpretation"
and that the process at bar was a "manufacturing operation
performed by Uniroyal in [Canada]".  <u>Id</u>.

The result of that operation in that case, however, was
a genuine change or advancement in the character of the merchan-
dise.  This the plaintiff does not show herein.  Whatever the pro-
cessing of its goods, as stipulated above, the unaltered facts are
that scraps of stainless steel entered the Newmet yard(s) and that

scraps of stainless steel exited those premises.  Ergo, the plain-

tiff is not entitled to the benefit of item 806.30, TSUS, <u>supra</u>.

III

In view of the foregoing, plaintiff's motion for summary

judgment must be denied; judgment for the defendant, dismissing

this action, will enter accordingly.

Decided:  New York, New York
          August 8, 2003


_____
                                        Judge