(C. D. 1052)

INTERNATIONAL PAINT CO., INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided May 8, 1947)

*James W. Bevans* for the plaintiff.
*Paul P. Rao,* Assistant Attorney General (*Richard E. FitzGibbon,* special attorney), for the defendant.

Before OLIVER, COLE, and MOLLISON, Judges

MOLLISON, Judge: In this case plaintiff seeks refund under the provisions of section 313 (a) of the Tariff Act of 1930 (19 U. S. C. 1940 ed. § 1313 (a)) [1] of 99 per centum of the duties paid upon the

---

[1] SEC. 313. DRAWBACK AND REFUNDS.

(a) ARTICLES MADE FROM IMPORTED MERCHANDISE.—Upon the exportation of articles manufactured or produced in the United States with the use of imported merchandise, the full amount of the duties paid upon the merchandise so used shall be refunded as drawback, less 1 per centum of such duties, except that such duties shall not be so refunded upon the exportation of flour or by-products produced from wheat imported after ninety days after the date of the enactment of this Act. Where two or more products result from the manipulation of imported merchandise, the drawback shall be distributed to the several products in accordance with their relative values at the time of separation.

importation of merchandise which it is claimed was subsequently used in this country in the manufacture or production of articles which were thereupon exported from the United States.

The facts are not in dispute and appear from the record to be as follows: The merchandise as imported consisted of paint in paste form, containing, among other things, some 77 per centum of copper and copper compounds, and, as impurities mixed with water, certain strong mineral acids as well as salts of iron and copper. The presence of these impurities rendered the imported product unfit for use as an anti-fouling paint designed for preventing marine growth on the bottoms of steel ships, and the purpose and effect of the processes to which the imported paint was subjected in this country were to remove the impurities and make a product capable of use as an anti-fouling paint. The chief ingredients which accomplish this result are the copper and copper compounds, and it is apparent that the processing applied to the imported material here did not affect the copper and copper compounds, but only removed the impurities and incidentally changed the form of the paint from paste to semipaste form.

Some of the impurities were removed merely by opening the containers in which the paint was imported and tipping out the aqueous solution containing a portion of the impurities which floated on top of the paste. More of the impurities were still left in the paste after this was done, and in order to remove them the paste was dumped into a mechanical mixer, having paddles, and from time to time, as the aqueous solution came to the surface, the mixer was stopped and the impurities ladled off. Varnish was then added to the paste, which reduced its viscosity and released the balance of the impurities. These came to the surface in an aqueous solution during operation of the mixer and were also ladled off. The remaining material, which was the exported product and consisted of usable anti-fouling paint, was then run off into shipping containers.

Drawback was denied on the ground that the processes to which the imported paint had been subjected in this country did not render the exported article one which had been "manufactured or produced in the United States with the use of imported merchandise" within the meaning of that phrase as used in section 313 (a), *supra*.

The question of the meaning to be given to the words quoted has engaged the attention of this and our appellate court many times. The latest expression on the subject is to be found in *United States* v. *Samuel Dunkel & Co., Inc.*, 33 C. C. P. A. 60, C. A. D. 317. There certain bulk butter was imported in blocks of 56 pounds each. After importation it was forced through a die which extruded it in roll form, whereupon it was packed in cylindrical one-pound cans which were later exported. While the description of the process seems to imply that it was relatively simple, it does appear that a substantial amount

of manipulation and the use of machinery were involved in the transformation of the bulk butter into tinned butter.

A majority of the Court of Customs and Patent Appeals, in reversing the decision of this court in the plaintiff's favor, pointed out that "The article imported was butter, and the article exported was the same butter," the change having been merely in form or shape. Such change, it was held, did not meet the requirement of the statute that the exported article must be "manufactured" or "produced" with the use of the imported merchandise or materials.

We think a distinction in the material facts is discernible between the instant case and the *Dunkel* case. In the latter case, as has been said, butter came in, and the same butter went out, unchanged save in form. Here a paste paint came in, containing impurities which caused it to be unfit for a specific paint purpose, i. e., as an anti-fouling paint, but the paint sent out was changed not only in form but also in use. Whether in its imported condition it had other uses is not revealed by the record, although in view of its high copper content it is probable that it was from the beginning intended to be used, when suitably processed, as an anti-fouling paint.

It is clear that the defendant's interpretation of the drawback statute would require a rather radical change to be made in imported materials before the resultant products could be said to have been "manufactured" or "produced" with their use. Indeed, it would seem that the defendant would require that the imported material be so completely transformed that a new and different article would emerge. Counsel for the defendant, in the brief filed in its behalf, cites the classic definition of the term "manufacture" found in the case of *Ishimitsu* v. *United States*, 11 Ct. Cust. Appls. 186, T. D. 38963, to the effect that—

\* \* \* to constitute a manufacture of a thing, or a thing manufactured, it must appear that something has been produced so changed or advanced in condition from what it was before being subjected to the processing or treatment that whether of only one material or of more than one, it has attained a distinctive name, character or use, different from that originally possessed by the material or materials before being subjected to the manufacturing process.

and argues that neither the name, character, nor use of the imported paint was changed by reason of the processing it received in this country.

We note that the requirements of change of name, character, or use given in the definition are stated in the disjunctive, and while it is true that both the imported and exported products bore the name "paint," and the character of both remained the same in the sense that the active ingredients, copper and copper compounds, were not acted upon by the processing, nevertheless, it seems clear that the processes through which the imported paint passed in this country

did more than change the form of the paint which arrived here and conferred upon it a use, as a merchantable and usable anti-fouling paint, which it did not possess upon arrival in this country.

However, we need not rest our decision in this case on the foregoing alone. Without considering the possible application of the term "produced" as used in the statute, we are satisfied that the exported paint was "manufactured" within the meaning of that term as used in the statute. The verb "to manufacture" and its derivatives have two connotations in tariff construction. On the one hand, particularly when relating to tariff designations embodying the words "manufactures of," it has been held that the transformation of a material into a new article of commerce, different from the material with the use of which it was made, is required. On the other hand, particularly when relating to tariff designations concerning articles or materials "manufactured," they have been held to import no more than a processing operation, which, although it advances the material, the subject of the process, in condition or value, or both, still leaves it that material. See in this connection a very illuminating discussion of the matter in the opinion of the Court of Customs and Patent Appeals in the case of *United States* v. *Nippon Co. et al.*, 32 C. C. P. A. (Customs) 164, C. A. D. 303, and the cases therein cited.

It is at once apparent, not only from a reading of the language of the drawback statute itself, but from a perusal of the long list of so-called "drawback rates" published from time to time by the Treasury Department, that the application of the drawback provision was not limited, either by Congress or by the executive agency charged with its administration, to cases wherein new articles are created with the use of imported materials, but that it covers as well cases wherein imported materials have been processed in this country without changing their essential nature. Thus, drawback has been allowed, and properly so, we think, when the processes have been dyeing, embroidering, finishing, refining, and the like, and we can conceive of no difference, from a tariff point of view, between those processes and the process of purification involved in the instant case. They all involve advancement of materials, and are within not only the letter of the drawback law but as well its purpose, which is the promotion of foreign commerce and the encouragement of American labor and industry.

Much is made by counsel for the defendant of the fact that the process in the instant case was relatively simple. We incline to the view that however simple it may have been it was substantial in character, requiring both hand labor and the use of machinery, and quite in keeping with the aforementioned purpose and spirit of the drawback statute.

The protest claim is therefore sustained, and judgment will issue directing the collector to reliquidate the drawback entry involved accordingly.