**ACETO CHEMICAL CO., Inc.**

v.

**UNITED STATES.**

**C.D. 3058; Protest No. 63/2208–27574–61.**

United States Customs Court,
First Division.
July 17, 1967.

Siegel, Mandell & Davidson, New York City (Murray Sklaroff and David Serko, New York City, of counsel), for plaintiff.

Carl Eardley, Acting Asst. Atty. Gen. (Charles P. Deem, New York City, Trial Atty.), for defendant.

Before WATSON, Judge, and OLIVER and WILSON, Senior Judges.

WILSON, Judge:

This protest covers certain merchandise imported from England in March 1961. The involved material was invoiced as "EMPICOL TSL." It was classified under paragraph 2 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739, as a triethanolamine salt and was assessed compound duty at the rate of 15 per centum ad valorem plus 3 cents per pound. A tax was also imposed against the merchandise under the Internal Revenue Act, but that levy is not under protest.

The plaintiff claims the imported product properly classifiable under paragraph 61 of the Tariff Act of 1930, as modified, supra, which provides for "all preparations used as applications to the hair, mouth, teeth, or skin, such as cosmetics, dentifrices, tooth soaps, pastes, theatrical grease paints, pomades, powders, and other toilet preparations * * not containing alcohol," and properly dutiable at the rate of 18¾ per centum ad valorem. By amendment to its protest, the plaintiff claims alternatively that the Empicol TSL under consideration should be classified under paragraph 13 of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, T.D. 54108, as "liquids for cleaning, not specially provided for, and not containing alcohol," at the rate of 6 per centum ad valorem. The plaintiff places its principal reliance upon this alternative claim.

The Government concedes that on the record in this case the classification of the merchandise before us is erroneous, i. e., that it is not properly dutiable under paragraph 2 as a salt of triethanolamine or a mixture in chief value of such a salt. It is, therefore, unnecessary to give further consideration to said paragraph 2.

The only statutes to be considered by the court in resolving the issues herein presented are, therefore, paragraphs 13 and 61 of the Tariff Act of 1930.

Paragraph 13 of said act, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, T.D. 54108, reads as follows:

> Blackings, powders, liquids, and creams for cleaning or polishing, not specially provided for, and not containing alcohol . . . . . . . . . . . 6% ad val.

Paragraph 61 of said act, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739, provides:

> * * * all preparations used as applications to the hair, mouth, teeth, or skin, such as cosmetics, dentifrices, tooth soaps, pastes, theatrical grease paints, pomades, powders, and other toilet preparations, all the foregoing:
>
> * * * * * *
>
> not containing alcohol . . . . . . . 18¾% ad val.

The only point remaining to be resolved is whether the plaintiff has satisfactorily shown by competent evidence that the Empicol TSL at bar should be classified either under paragraph 13 of the Tariff Act of 1930, as modified, supra as a liquid for cleaning, or under paragraph 61 of said act, as modified, supra, as a "preparation used as an application to the hair."

The evidence consists of the testimony of three witnesses, two called by the plaintiff and one by the defendant, together with five exhibits introduced by the plaintiff and one by the defendant.

Plaintiff's exhibit 1 consists of a representative sample of the imported

merchandise. It is a colorless, odorless liquid contained in a bottle.

Plaintiff's exhibit 2 consists of a report setting forth an analysis made by plaintiff's witness, Seymour Mann, of the liquid contents of exhibit 1.

Plaintiff's illustrative exhibits 3 and 4, and plaintiff's collective illustrative exhibit 5, consist of various brands and types of shampoos obtainable in the retail market in New York City.

Defendant's illustrative exhibit A was identified as a bottle of "Silvikrin" shampoo allegedly produced by Beecham Products.

The uncontradicted evidence in the record before us establishes that the merchandise at bar consists of a liquid (plaintiff's exhibit 1) containing neither coloring matter nor perfume; and that it is a chemical mixture containing the following substances (plaintiff's exhibit 2):

| | | |
|---|---|---|
| 36% | – | triethanolamine lauryl sulfate |
| 3.6% | – | lauric isopropanolamide |
| 1% | – | neutral fatty compound |
| 1% | – | triethanolamine sulfate |
| 58.4% | – | water |

It is also admitted that the product does not contain ethyl alcohol.

It should also be noted that the Empicol TSL under consideration is admittedly a surface cleaning liquid or agent.

Page 5 of brief of counsel for the defendant states the following:

The record leaves no doubt that the primary constituent of Empicol TSL, viz., triethanolamine lauryl sulfate, is a synthetic detergent. Nor is there any question but that the primary use of detergents, synthetic or otherwise, is in connection with their cleaning properties. Further, Empicol TSL is unquestionably a liquid, containing no ethyl alcohol. * * *

The two witnesses for the plaintiff and Dr. Lada, who testified for the defendant, agree that the imported product is a surface cleaning agent.

While plaintiff's witnesses testified that the product at bar is a shampoo in its imported condition, neither of them had ever seen it used as such. They also testified that the Empicol TSL in question is a cleaning liquid of excellent quality. Their position was, however, that the material as imported, while a most effective liquid cleaning agent for many purposes, was too expensive for any use other than shampoo. On the other hand, Dr. Lada who testified for the defendant stated that the involved merchandise in its condition as imported was definitely not a shampoo, and could not be used as a shampoo until some additional ingredients were added. Referring to plaintiff's exhibit 1, Dr. Lada testified as follows:

Q. In your opinion, is that suitable as a base for a commercially feasible shampoo?—A. As it stands by itself, it is not suitable. As a base, with the addition of other materials suitably diluted, and all the other accouterments that are used in the cosmetic industry, it might then be suitable, but not as it sits now. [R. 57.]

Dr. Lada also testified concerning various uses for which Empicol TSL might be commercially feasible. On this point he stated:

Q. Now, you said that the product, assuming it has the same formulation as in Exhibit 1, could be put to other uses. What other uses?—A. It could be put to other uses, just as it would be with shampoos. It would have to be further modified, because it's unsuitable for use as it stands. It could be made into a bubble bath by raising the alkanolamide content, and cutting back the lauryl sulfate compound. It could be used to some extent in liquid dishwashing, especially today, when lauryl sulfates are looked upon as detergents desired in sewage systems, and in fact there is strong indication that lauryl sulfates may take part of this market. It could be used to some extent, and is sold by us to some extent, modified other than that, for certain car washing applications. It has

several industrial uses, which I can't, for our own proprietary reasons, divulge at the moment, all having to be modified beyond this.

Q. All in the cleaning field though?—A. One of the industrial uses would not be cleaning, but the others essentially are some method of cleaning; that is correct. [R. 62–63].

From the evidence including the sample of the imported merchandise (exhibit 1) there can be no doubt that the Empicol TSL as imported could be used only as a liquid cleaner of some sort. We agree with the testimony of Dr. Lada that its commercial uses were varied and not limited to shampoo.

It should be observed at this point that the additives referred to throughout the testimony, as required to make the Empicol TSL more suitable for use as a shampoo, add nothing to and detract nothing from the qualities of the product as a liquid cleaning agent. In its imported condition, the merchandise was, according to the uncontradicted testimony, a liquid cleaning agent, and it would remain such whether the additives referred to in the testimony were put into it or water was used to dilute it. Neither did Dr. Lada suggest changing the nature of the composition of the material in adapting it for uses other than shampoo. It would still be composed of triethanolamine lauryl sulfate, lauric isopropanolamide with a neutral fatty compound.

Webster's Third New International Dictionary published in 1966 gives the following definitions for some of the words used by the witnesses in describing Empicol TSL:

surfactant    SURFACE–ACTIVE AGENT

surface-active agent: a substance useful for its cleansing, wetting, dispersing, or similar powers (*surface-active agents*—in dilute aqueous solution—Donald Price)—called also *surfactant* * * *

wetting agent or wetting-out agent: any of numerous water-soluble or liquid usu. synthetic organic substances that promote spreading of a liquid on a surface or penetration into a material esp. by their oriented adsorption on the surfaces in such a way that the wetting liquid is no longer repelled and that are used in mixing solids with liquids, in spreading liquids on surfaces, and as penetrants (as in the textile industry or in spraying with insecticides or fungicides): a surface-active agent having higher wetting power than detergent or other powers

detergent: a cleansing agent: as a: soap b: an inorganic alkali, an alkaline salt (as a sodium phosphate or a sodium silicate), or a mixture of such compounds for use esp. in cleaning metals (as in dairy equipment)—called also *alkaline detergent* c: any of a large number of synthetic water-soluble or liquid organic surface-active agents for use in washing that resemble soaps in the ability to emulsify oils and hold dirt in suspension but differ in other respects (as in non-precipitation of calcium and magnesium salts from hard water and in chemical composition)—called also *synthetic detergent* * * * d: an oil-soluble substance that holds insoluble foreign matter in suspension and is used in lubricating oils and dry-cleaning solvents

There is, therefore, no ground for speculation concerning the nature and properties of the liquid cleaning agent Empicol TSL.

Plaintiff's primary contention is that the merchandise at bar is a liquid for cleaning under the provisions of paragraph 13 of the Tariff Act of 1930, as modified, supra. The importer further argues that if the Empicol TSL is not classifiable under paragraph 13, then it is dutiable under paragraph 61, while the defendant contends that while the collector's classification was erroneous the plaintiff has failed to sustain the burden of proof incumbent upon it to

establish that the importation is properly classifiable under either paragraph 13 or paragraph 61.

In support of its contention that the merchandise at bar is a liquid for cleaning provided for under the provisions of paragraph 13, supra, plaintiff cites the cases of Abercrombie & Fitch Co., v. United States, 71 Treas.Dec. 161, T.D. 48779; C. J. Tower & Sons of Buffalo, Inc. v. United States, 46 Cust.Ct. 422, Abstract 65455, and Border Brokerage Company, Inc. v. United States, 56 Cust. Ct. 16, C.D. 2606, decided December 29, 1965, and not appealed.

In the *Abercrombie & Fitch* case, supra, decided in 1937 the product involved was imported from England under the name "Dryfoot." The facts in this case as set forth in the court's opinion are as follows:

The sample shows a label of that name accompanied by the words, "The Ideal Waterproof." The sample shows a yellowish cream with the statement upon the bottom of the container as follows:

### DRYFOOT

represents the natural fat in human and animal skins and hides, and is readily absorbed by them. It leaves a deposit in the pores of skins and leather which makes them impervious to all wet and damp. DRYFOOT prolongs the life of new leather and gives new life to old and perished leather.

### DIRECTIONS FOR LEATHER

Apply a *small* quantity evenly over the surface and allow it to soak in. Then polish with a soft cloth. For black leather, if a high polish is desired, finish off by polishing with ordinary blacking.

### MEDICINAL AND VETERINARY DIRECTIONS

The antiseptic qualities of DRYFOOT make it a perfect dressing for sore feet and all wounds where it is desirable that a natural grease should be absorbed by the skin.

The plaintiff claimed the merchandise in the above case dutiable at 20 per centum ad valorem as an unenumerated manufactured article under paragraph 1558 of the Tariff Act of 1930. A chemical analysis of the involved merchandise showed the following composition:

Petroleum or mineral grease .. 95.2%
Castor oil ............... 4.2%
Moisture ................. 6%

In overruling the protest the court stated:

While the evidence shows that the primary purpose of the article is to keep the leather to which it is applied dry, the record also shows that it has a polishing effect which brings it within the terms of paragraph 13, as a polishing cream, as against the more general unenumerated paragraph.

In the C. J. Tower & Sons case, supra, the importation under consideration involved "Certain merchandise invoiced as 'Diversol Chlorinated Trisodium Phosphate.'" The collector classified the material involved as a chemical compound not specially provided for under paragraph 5 of the Tariff Act of 1930, as modified. The importer claimed the material more properly classifiable under paragraph 13, as modified, providing for "Blackings, powders, liquids, and creams for cleaning or polishing, not specially provided for, and not containing alcohol." In other words, the importer asserted that the merchandise in question was a powder for cleaning. The court set forth the following as undisputed facts in that case:

\* \* \* The powder in question is composed of three chemicals, namely, sodium hydroxide, commonly called caustic soda, phosphoric acid, and chlorine. In the manufacture of the powder, disodium phosphate and trisodium phosphate are mixed to produce a liquor; then, more caustic soda or sodium hydroxide is treated with gaseous chlorine to form a liquid known as sodium hypochlorite. The two liquors are then combined, producing a chemical reaction which results

in crystallization. After passing through a drying process, the crystals become a powder, which is the finished product, except that, at the time the two liquors above referred to are blended, a slight amount of coloring dye or potassium permanganate is added, which give the finished product the pinkish color observed in plaintiff's illustrative exhibit 1. * * *

In its holding the court said:

The issue for determination is, therefore, whether the product is a cleaning powder, as contended by the plaintiff, or a chemical compound or mixture, not specially provided for, as classified.

The evidence in the record in the *Tower* case indicated that the involved material was used as a cleanser in various industries. On this point one witness testified as follows: that the merchandise involved, known by the trade name of "Diversol" is marketed as "a cleaning powder, cleaning compound, for use in the industry."

In deciding the case the court held as follows:

However, on the basis of the record here presented which, in our opinion, establishes that the involved product has substantial uses as a cleaning agent, we hold the merchandise properly dutiable under paragraph 13 of the Tariff Act of 1930, as modified by the Sixth Protocol to the General Agreement on Tariffs and Trade, T.D. 54108, at the rate of 6 per centum ad valorem, under the provision therein for "Blackings, powders, liquids, and creams for cleaning or polishing, not specially provided for, and not containing alcohol," * * *

The court pointed out that while the imported merchandise was advertised as a bactericide, disinfectant, and deodorant, and it was conceded that the merchandise in question served the purpose of a bactericide, disinfectant and deodorant, its principal use was as a cleaner.

In the case of *Border Brokerage,* supra, the merchandise was invoiced as "N423 Dipping Paint, with titanium" and certain other similar paints. The imported paints were classified under paragraph 24 of the Tariff Act of 1930 as chemical mixtures or alcoholic compounds not specially provided for, containing under 20 per centum alcohol. The importer contended that the imported paints were properly dutiable under paragraph 66 of the Tariff Act of 1930, as modified, providing for "Pigments, colors, stains and paints * * * whether dry, mixed, or ground in or mixed with water, oil, or solutions other than oil, not specially provided for * * Other."

In that case the court, in commenting on the facts, said:

* * * The uncontradicted testimony of Mr. Ekins established the fact that plaintiff's exhibit 1 sets forth the formulas used in the manufacture of the imported items designated as "N423 Dipping Paint, with titanium," "N429 Navaho Paint," "N430 Doeskin," and "N431 Beige." Mr. Ekins' testimony also shows that plaintiff's exhibit 2 is "a paint formula for a dip paste, which would be further reduced before being used" * * * and is the formula for the item designated on the invoice, covered by entry 5943, as "S–914" * * *.

The facts in the foregoing case indicated that the materials involved were manufactured for use in coating cedar shakes.

It was contended by the plaintiff in the *Border Brokerage* case, supra, that the imported materials were more specifically provided for under paragraph 66 of the Tariff Act of 1930 than under paragraph 24, as classified.

Since it is a well established rule that importations must be classified in the condition in which they are imported, and since in the *Border Brokerage* case, supra, solvents and thinners were added to the paint before it was used, the Government contended that the ma-

terial could not be classified as a paint. Commenting upon the Government's position the court held:

> While the rule is well settled to the effect that imported merchandise must be classified in the condition as imported, as held in United States v. Citroen, 223 U.S. 407 [32 S.Ct. 259, 56 L.Ed. 486], and United States v. Lo Curto & Funk, 17 CCPA 342, T.D. 43777, that does not mean that, where goods prior to exportation have been so far processed or manufactured that they are commercially fit for only one use, they may not be made ready after importation for actual use without violating the general rule. In the case at bar, the mere addition of the solvent to the product herein which, after importation, possesses the characteristics rendering it fit for use as a stain on shingles, fixes its classification prior to importation as a stain. There are numerous cases supporting the above-stated position. See R. C. Williams & Co., Inc. v. United States, 4 Cust.Ct. 227, C.D. 328, at 230; Oxford University Press, N. Y., Inc. v. United States, 20 Cust.Ct. 78, C.D. 1088.

It is also argued in the case at bar that, since there is evidence to the effect that the imported Empicol TSL required some additives or had to be diluted before being applied as a cleaner, it cannot be classified as either an application for the hair or a liquid for cleaning.

This is not in accord with the evidence. All of the witnesses conceded that the material in its imported condition could be used as a liquid cleaner but that it would be too expensive, because of the high concentration of triethanolamine lauryl sulfate, to be competitive with other cheaper cleaners. It seems apparent from the record in this case, however, that the mere use of water to dilute the preparation would in large measure overcome the objection on the basis of cost. Furthermore, the uncontroverted evidence shows that the Empi-

col TSL as imported had no other use except as a cleaning agent.

The Government places its principal reliance upon certain old cases so poorly reported that little meaning can be extracted from them, and upon legislative history. Borsum Bros. v. United States, 24 Treas.Dec. 677, Abstract 32264, decided in 1913, cited by defendant, is so brief that it cannot be said to be of any value in deciding the case at bar. The complete decision reads as follows:

> A commodity used in the manufacture of liquid metal polish, assessed under paragraph 56, tariff act of 1909, was claimed to be dutiable as wrought earth (par. 90). Protests sustained.

It cannot be determined from the text of the decision what type of earth was wrought, nor can it be ascertained what work was done upon it or what its condition was as imported.

In a later *Borsum* case, 27 Treas.Dec. 111, T.D. 34697, the importation was invoiced as polishing earth, and was classified and assessed by the collector under paragraph 11 of the Tariff Act of 1913. The importer claimed the involved commodity to be free of duty under paragraph 518 or 549, or alternatively dutiable under paragraph 76 of the Tariff Act of 1913.

It is difficult from the decision to determine really what type of material was involved. In its opinion the court stated:

> The testimony shows that it is the same as the earth which was the subject of the board's decision in Borsum Bros.' case, Abstract 32264 (T.D. 33409), and the record in that case was by agreement of counsel incorporated in the record in this case. * *

The court further states that—

> The testimony shows that the merchandise in question is used in the manufacture of polishing creams and polishing pastes. It would appear from the testimony that if the merchandise is used at all in its present condition for polishing, it is used to

a very limited extent. So far as this importer is concerned, practically the sole use made of the commodity in question is as an ingredient in the manufacture of polishing preparations. This is done by mixing the commodity with oil and grease. * * *

It will be noted that the testimony in this case indicated that "practically the sole use made of the commodity in question is as an ingredient in the manufacture of polishing preparations," and that that was done by mixing the imported material with oil and grease.

The foregoing case is of no value as a guide in resolving the issues in the case at bar. In the case now before us, it is conceded that the imported material in its imported condition is a synthetic detergent and that the "primary use of detergents, synthetic or otherwise, is in connection with their cleaning properties." The testimony in the instant case, both that of the plaintiff and defendant, establishes that the Empicol TSL, the merchandise involved, is a surface cleaning agent in its condition as imported.

It should also be noted that this old *Borsum* case cannot be squared with the much later decisions of Abercrombie & Fitch (1937), supra; and C. J. Tower & Sons (1961), supra. These later cases place a much more liberal construction upon paragraph 13.

The case of Calhoun, Robbins & Co. et al. v. United States, 8 Ct.Cust.Appls. 360, T.D. 37624, is cited in defendant's brief in support of the following contention:

Paragraph 13 contains a not specially provided for clause, while paragraph 61 does not. This distinction, while not necessarily determinative in all situations, is such as has been held to be strongly indicative of a legislative intent to impose duty on articles described with equal specificity by two or more provisions pursuant to the unqualified provision.

The rule as stated in the *Calhoun, Robbins* case is as follows:

The cases in which an interpretation of two conflicting paragraphs may be controlled by the not otherwise specially provided for provision are restricted to those in which the two paragraphs apply with equal specificity to the article in question.

In the opinion of the court, the case cited does not support the defendant's contention. The merchandise here involved is not described with equal specificity in the two supposedly competitive paragraphs, that is, paragraphs 13 and 61 of the Tariff Act of 1930.

It would be difficult to conceive of more general and less specific tariff provisions than those set forth in paragraph 61 of the Tariff Act of 1930 which provides for "all preparations used for applications to the hair, mouth, teeth or skin, such as cosmetics, dentifrices, tooth soaps, pastes, theatrical grease paints, pomades, powders, and other toilet preparations * * *."

■ It is common knowledge that there are numerous preparations for application to the hair. It should also be observed that shampoo as such is not provided for in paragraph 61. On the other hand, paragraph 13 provides for "Blackings, powders, *liquids,* and creams for *cleaning* or *polishing*, not specially provided for * * *." [Emphasis added.] This difference between these two paragraphs points up what is held in the *Abercrombie & Fitch* case, i. e., since the merchandise in question had a polishing effect although used for other purposes it was properly dutiable under paragraph 13, as a polishing cream, rather than under the more general provision of paragraph 1558.

The defendant cites one case decided under the Tariff Act of 1922, which was the first tariff legislation containing a paragraph identical to paragraph 13 of the act of 1930.

Keystone Bros. v. United States, 57 Treas.Dec. 1031, Abstract 10729, the case cited by defendant, has no application whatever as a guide in reaching a decision in the instant case. The testi-

mony in that case indicates that the involved merchandise was a soap and that soap was specifically provided for under the provisions of paragraph 82 of the Tariff Act of 1922. The entire opinion in the case reads as follows:

From the testimony it appeared that the merchandise consists of "Properts saddle soap," chiefly used for washing harness. The claim at 15 per cent under paragraph 82 was sustained.

Several other cases cited by the Government do not support the defendant's position.

In American Shipping Co., C. F. Wunderlich & Co. v. United States, 19 CCPA 304, T.D. 45470, the court really skirted the question of whether the involved product was in fact a soap. Since the merchandise was used exclusively as a shampoo for the hair and scalp, the court attempted to distinguish the cases of United States v. Conover et al., 17 CCPA 462, T.D. 43917, and United States v. Yardley (Ltd.), 16 CCPA 499, T.D. 43226. In the *Conover* and *Yardley* cases, the court specifically found the merchandise involved to be soap.

In the case of Wm. S. Hansell & Sons v. United States, 8 Treas.Dec. 119, T.D. 25495, the court found as a fact that the involved merchandise was a soap dutiable under paragraph 72 of the Tariff Act of 1897. There was, therefore, no basis for the collector's classification of the merchandise under any other paragraph than that providing specifically for soap.

In the case of William Dixon, Inc. v. United States, 27 Cust.Ct. 154 C.D. 1362, the merchandise was referred to as "ruby powder." This material was classified as a pulverized artificial abrasive under paragraph 1514 of the Tariff Act of 1930. The importer claimed the importation properly classifiable at 12½ per centum ad valorem under paragraph 13 of the Tariff Act of 1930, as modified by T.D. 49753. Paragraph 1514 provided for "Emery, corundum, garnet, and artificial abrasives, * * *" while paragraph 13 covers "Blackings, pow-

ders, liquids, and creams for cleaning or polishing * * *." In its opinion, the court stated the problem before it as follows:

This being so, the question at issue is the relative specificity of the terms, that is to say, since the ruby powder at bar is both an artificial abrasive and a powder for polishing, which of the terms more narrowly describes the merchandise involved? That the latter designation, which designates the particular function or use of the merchandise, more specifically describes the product before us than the former, which while also connoting use *does so as a class*, we think is at once apparent.

The court, therefore, held the merchandise properly classifiable under paragraph 13. There is no merit in the contention of the defendant that its position that the material now under consideration is not classifiable under paragraph 13 of the Tariff Act of 1930, as modified. The *Wm. Dixon* case, supra, in our opinion, really supports classification under paragraph 13.

The merchandise involved in Graf Bros. v. United States, 6 Ct.Cust.Appls. 190, T.D. 35440, was a tinted or colored powder used for polishing finger nails. It was classified and assessed under paragraph 48 of the Tariff Act of 1913, and was claimed to be dutiable under paragraph 11 of the same act. Paragraph 11 of the Tariff Act of 1913 provided for "Blacking of all kinds, polishing powders, and all creams and preparations for cleaning or polishing, not specially provided for in this section * * *."

It will be noted that the provisions of paragraph 11 of the act of 1913 differed materially from the provisions of paragraph 13 of the act of 1930. The latter paragraph provides for "Blackings, powders, *liquids*, and creams for cleaning or polishing, not specially provided for * * *." [Emphasis added.] It will be noted that the word "liquids" does not occur in the act of 1913.

Paragraph 48 of the Tariff Act of 1913 provided for "Perfumery, including cologne and other toilet waters, articles of perfumery, whether in sachets or otherwise, and all preparations used as applications to the hair, mouth, teeth, or skin, such as cosmetics, dentifrices, including tooth soaps, pastes, including theatrical grease paints, and pastes, pomades, powders, and other toilet preparations * * *."

Paragraph 61 of the Tariff Act of 1930 contains substantially the same provisions.

In the *Graf Bros.* case, supra, the court held that merchandise properly classifiable under paragraph 48 of the Tariff Act of 1913 upon the ground that said paragraph "seems to cover a great variety of what are commonly known as toilet articles or preparations, as well as some that may not strictly speaking, be such."

It would seem that the court had in mind that the merchandise involved was really a toilet preparation for it stated "we think the term 'and other toilet preparations' embraces the merchandise here." It is difficult to see how this case can be construed really as a contest between paragraphs 11 and 48 of the Tariff Act of 1913, as contended by the defendant. Nor, under the wording of the paragraphs of the act of 1913 and the provisions of paragraph 13 and 61 of the 1930 act can it be said that the said case can be construed to support an argument that if the merchandise there involved were now in question it would be classified under paragraph 61 rather than under paragraph 13. Such a conclusion is without merit.

In the case of Downing v. United States, 1 Ct.Cust.Appls. 500, T.D. 31530, there was no competition between two separate paragraphs of the tariff act involved. Two separate provisions of the same paragraph were before the court. The head note in the case refers to paragraph 69 of the Tariff Act of 1897 but in the body of the decision paragraph 69 of the act of 1909 is construed. That paragraph reads as follows:

69. Castile soap, one and one-fourth cents per pound; medicinal or medicated soaps, twenty cents per pound; fancy or perfumed toilet soaps, fifty per centum ad valorem; all other soaps not specially provided for in this section, twenty per centum ad valorem.

This case has no apparent application to the case at bar wherein the competition is between paragraph 61 of the Tariff Act of 1930 which provides for "Perfumery, including cologne and other toilet waters, articles of perfumery, whether in sachets or otherwise, and all preparations used as applications to the hair, mouth, teeth, or skin * * *," and paragraph 13 of the Tariff Act of 1930, which provides for "Blackings, powders, liquids, and creams for cleaning or polishing, not specially provided for * * *." Clearly, liquids for cleaning are not otherwise specially provided for in paragraph 61 or any other paragraph that has been called to our attention. Only items for cleaning or polishing are provided for under paragraph 13 while articles having a wide variety of uses are contained in paragraph 61.

In the *Tsue Chong Yuen & Co.* case, 35 Treas.Dec. 350, Abstract 42545, which is cited by the defendant, the decision is so meager that little can be determined by the reading of it. It did hold that merchandise invoiced as Chinese washing stuff was properly classifiable as a nonenumerated manufactured article under paragraph 385 of the Tariff Act of 1913, rather than as a toilet preparation under paragraph 48 of the same act. The only reason given for the decision was that it was based on the authority of Abstract 41762. That abstract is in the case of *Tsue Chong Yuen & Co.*, 34 Treas.Dec. 616, Abstract 41762. There is little additional light in that case except that it appears that the material in question had to be manipulated or further manufactured before it could be used as an application to the hair. The general appraiser who wrote the opin-

ion makes the unsupported and unexplained statement that "paragraph 48 seems to contemplate articles which are ready to be applied without further treatment." It is difficult to see how that case can have any application in resolving the case at bar.

In accordance with the uncontradicted evidence in the record before us, we find that the involved merchandise, as represented in plaintiff's exhibit 1, contains neither coloring matter nor perfume, and that it is a chemical mixture containing the substances as set forth in plaintiff's exhibit 2, supra. We further find that the imported material contains no alcohol, and that it is a liquid detergent used as a surface cleaning agent.

The facts in this case do not warrant a finding that Empicol TSL, the merchandise involved herein, is embraced within the provisions "all preparations used as applications to the hair" under paragraph 61 of the Tariff Act of 1930, as modified, as opposed to its classification under paragraph 13 of said act, as modified, as a liquid for cleaning. The court is of the opinion that the use of this material is more specifically provided for under liquids for polishing or cleaning than under "all preparations used as applications to the hair." The nature of the product itself and its basic use as a surface cleaning agent convince the court that it is essentially a liquid for cleaning and not merely a shampoo. Even a shampoo is a cleaning agent.

After careful consideration of the evidence in this case and the law applicable thereto, the court is of the opinion that the involved merchandise is properly classifiable under paragraph 13 of the Tariff Act of 1930, as modified.

The protest is sustained. Judgment will be entered accordingly.

### Concurring Opinion

WATSON, Judge:

I concur in the conclusions reached by Senior Judge Wilson in this case. In my opinion, the record herein supports the finding by him that the involved merchandise, in its condition as imported, is a liquid cleaning agent, and, as such, is properly classifiable under the provisions of paragraph 13 of the Tariff Act of 1930, as modified, for "Liquids, * * * for cleaning," not specially provided for, and not containing alcohol, as claimed.

### Dissenting Opinion

OLIVER, Judge:

I respectfully dissent from the view of my colleagues in this case because I feel that the record fails to support either claim advanced by the plaintiff herein.

Accepting as inappropriate the official classification, it of course remained plaintiff's burden to establish by competent and sufficient evidence the propriety of its own claims.

The testimony of plaintiff's witness Mann, president of the importer, indicates that he was in the chemical business, manufacturing and importing, and that he imported this merchandise and sold it to a shampoo company. He was totally unfamiliar with what they did to it or how, eventually, they sold it. Therefore, the remaining testimony of the witnesses Kalish and Lada, men of high qualification in the cosmetic field, is vitally important on the issue of identification and use. The record on this point is quite in conflict. Kalish, testifying for the plaintiff, said it is a shampoo and that he has made like formulae "which have been given to my clients by me for use as a shampoo" (R. 37). Since Kalish is and has been in the publishing and editing business for some time, it is not at all clear what clients or what similar shampoos he is referring to. He did admit he had never dealt in or even seen Empicol TSL as such. On the other hand, Lada, an active expert in the production of shampoos for the market, unequivocally stated that this formula, which he had seen before, is simply a raw material for shampoo and by no means a commercial product for

application to the hair. It requires not only the additives of color and perfume, but the presence of 36 percent triethanolamine lauryl sulfate is too strong to be used and requires significant modification.

However, it seems to me that whether this product is a shampoo or an unfinished shampoo is not in issue here. The statute, paragraph 61, contains no *eo nomine* provision for shampoo and the only requirement made necessary is use as a hair applicant. Use implies "chief use." Bob Stone Cordage Co. et al. v. United States, 51 CCPA 60, 67, C.A.D. 838. It is the use, not of the particular shipment but of the class or type of goods involved. Thus, plaintiff must show that Empicol TSL is itself a product chiefly used as a hair applicant or belongs to a class so used. The evidence is completely silent on how this product is actually chiefly used or whether it is ever used, as is, on the hair. There is some evidence that there are some products used which may be colorless *or* odorless, and Kalish said he made some shampoos with substantially the same formula as Empicol TSL. However, it is the chief use of a formula such as Empicol TSL which must be shown and not mere capability or susceptibility of use. On this record, I cannot see that that burden has been met.

On the other hand, with respect to plaintiff's claim under paragraph 13 of the tariff act as a liquid for cleaning, both Lada and Kalish agreed that any cleaning use outside of the hair would be economically unsound for this formula in its present state. The cleaning uses to which these witnesses testified were in the realm of possible, not actual or substantial. The witness Lada further stated, as he had with the shampoo question, that the product required further modification even for such possible uses.

In C. J. Tower & Sons of Buffalo, Inc. v. United States, 46 Cust.Ct. 422, Abstract 65455, relied upon by the majority, the merchandise there in issue had been produced and marketed as a cleaning powder, and had received substantial use as a cleaning agent in industry. I do not think the record in the present case supports any similar findings on the questions of marketability or use.

Classification of merchandise as imported is a well settled doctrine. It has particular pertinence here where we are dealing with provisions governed by use, use being the only significant requirement of the statute. The Border Brokerage Company v. United States, 56 Cust. Ct. 16, C.D. 2606, case, also referred to in the majority opinion, dealt with a provision naming paints specifically and we found there that the product was a paint by all the evidence presented. It was bought and sold as a paint on the market, it fit the definition of an emulsion paint appearing in the Encyclopedia of Chemical Technology, and it was normal for the user to add solvents or thinners in applying it.

However, there is no evidence in this case that Empicol TSL is ever sold on the market (except to a shampoo company which may purchase it as a raw material for its own marketed product) or that the various alterations required as stated by the witness Lada, and to a lesser extent by Kalish, are normally accomplished by users.

On the basis of the record before us here, I am of the opinion that there has been an insufficient showing that the imported merchandise is either chiefly used as an application to the hair as provided for under paragraph 61 or substantially used as a liquid cleaner as provided for under paragraph 13. I find it unnecessary, therefore, to reach the question of relative specificity and I would overrule the protest.