(C.D. 3977)

INTERNATIONAL PAINT CO. (CALIF.), INC.
W. C. AUGER & COMPANY
} *v.* UNITED STATES

United States Customs Court, First Division

(Decided March 11, 1970)

*Glad & Tuttle* (*George R. Tuttle, Jr., of counsel*) for the plaintiffs.
*William D. Ruckelshaus*, Assistant Attorney General (*Dominick M. Minerva* and *Robert Blanc*, trial attorneys), for the defendant.

Before WATSON, MALETZ, and RE, JUDGES

WATSON, Judge: The merchandise involved in this protest, invoiced as "Antifouling Paste Paint", was classified under item 403.90 of the Tariff Schedules of the United States at the rate of 3.5 cents per pound

plus 25 per centum ad valorem under the provision therein for mixtures in whole or in part of any of the products provided for in subpart B of part 1 of schedule 4 of said tariff schedules.

Plaintiffs claim that the merchandise should have been classified under item 474.30 of the tariff schedules at the rate of 8.5 per centum ad valorem as paints not containing titanium pigments.

The defendant, while adhering to its classification under item 403.90, alternatively claims the merchandise to be properly classifiable under item 409.00 as a mixture in whole or in part of any of the products provided for in subpart C, part 1, schedule 4 of the tariff schedules at the rate of 7 cents per pound, plus 45 per centum ad valorem, by virtue of the provision for pesticides in item 405.15 of the schedules. Plaintiffs, on their part, maintain that the involved paint paste is not dutiable under item 409.00, as alternatively claimed by the defendant, for the reason that such paint, in its imported condition, is not a pesticide and, unlike the other products listed under subpart C of part 1 of schedule 4, is not a finished product.

The statutes herein involved are as follows:

Tariff Schedules of the United States:

General Headnotes and Rules of Interpretation:

10. General Interpretative Rules. For the purposes of these schedules—

\*  \*  \*  \*  \*  \*  \*

(c) an imported article which is described in two or more provisions of the schedules is classifiable in the provision which most specifically describes it; but, in applying this rule of interpretation, the following considerations shall govern:

\*  \*  \*  \*  \*  \*  \*

(ii) comparisons are to be made only between provisions of coordinate or equal status, i.e., between the primary or main superior headings of the schedules or between coordinate inferior headings which are subordinate to the same superior heading;

\*  \*  \*  \*  \*  \*  \*

(h) unless the context requires otherwise, a tariff description for an article covers such article, whether assembled or not assembled, and whether finished or not finished;

Schedule 4:

Schedule 4 headnotes:

\*  \*  \*  \*  \*  \*  \*

3. (a) The term "mixtures", as used in this schedule, means substances consisting of two or more ingredients (i.e., elements or compounds), whether occurring as such in nature, or whether artificially produced (i.e., brought about by mechanical, physical,

or chemical means), which do not bear a fixed ratio to one another and which, however thoroughly commingled, retain their individual chemical properties and are not chemically united. The fact that the ingredients of a product are incapable of separation or have been commingled in definite proportions does not in itself affect the classification of such product as a mixture.

(b) The term "mixtures", as used in this schedule, includes solutions, except solutions defined as compounds in headnote 2(b) of this schedule.

Part 1 headnotes:

1. Except as specifically set forth in the headnotes to other parts of this schedule, all products described in this part shall be classified hereunder even if more specifically described elsewhere in this schedule. Any product described in both subparts B and C of this part shall be classified in subpart C.

Subpart B headnote:

1. The provisions of item 403.02 and 403.60, inclusive, in this subpart shall apply not only to the products described therein when obtained, derived, or manufactured in whole or in part from products described in subpart A of this part, but shall also apply to products of like chemical composition having a benzenoid, quinoid, or modified benzenoid structure artificially produced by synthesis, whether or not obtained, derived, or manufactured in whole or in part from products described in said subpart A.

Subpart C headnotes:

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

2. The term "pesticides" in item 405.15 means products, such as insecticides, rodenticides, fungicides, herbicides, fumigants, and seed disinfectants, chiefly used to destroy undesired animal or plant life.

Part 9 headnote:

1. Any product described in this part and also in part 1 of this schedule is classifiable under said part 1, except varnishes, inks, and artists', students', and children's pigments or paints.

Subpart C headnotes:

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

2. The term "paints and enamel paints" in this subpart covers dispersions of pigments or pigment-like materials with a liquid (vehicle) which are suitable for application to surfaces as a thin layer, and which dry (harden) to an opaque, solid film. The vehicle of paints consists of drying oils or resins which bind the pigment particles together in the film; and the vehicle of enamel paints is principally varnish. Paints and enamel paints may also contain thinners, driers, plasticizers, or other agents.

Classified under:

Schedule 4, Part 1, Subpart B, TSUS:

Cyclic organic chemical products in any physical form having a benzenoid, quinoid, or modified benzenoid structure, not provided for in subpart A or C of this part:

403.02        Anthracene having a purity of 30% or more by weight_____      * * *

\*    \*    \*    \*    \*    \*    \*

403.90   Mixtures in whole or in part of any of the products provided for in this subpart___   3.5¢ per lb. + 25% ad val.

Defendant's alternative claim:

Schedule 4, Part 1, Subpart C, TSUS:

405.15       Pesticides _____     * * *

\*    \*    \*    \*    \*    \*    \*

409.00   Mixtures in whole or in part of any of the products provided for in this subpart___   7¢ per lb. + 45% ad val.

Claimed under:

Schedule 4, Part 9, Subpart C, TSUS:

Paints and enamel paints:

474.30      Not containing titanium pigments___   8.5% ad val.

The record in this case consists of the testimony of two witnesses who testified on behalf of the plaintiffs, and, in addition, two exhibits offered and received in evidence on behalf of the plaintiffs, and one exhibit introduced in evidence by the defendant.

Exhibit 1 is a sample of antifouling paste offered as illustrative of the imported merchandise. Exhibit 2 is a letter offered to indicate the various chemical components of the imported merchandise. Exhibit A consists of a copy of a letter from the plaintiffs to the Bureau of Customs showing a specific breakdown of components of the involved product.

Plaintiffs' first witness was David E. Paterson, chemist and production manager at International Paint Company, manufacturers of marine paints and varnishes. He stated that he was familiar with the products imported by his company, including antifouling paste paint. His duties included controlling the quality of the products manufactured by his company, including supervision of all of its paint products manufactured from various ingredients. The uncontroverted

testimony of Mr. Paterson is to the effect that the imported material is in the form of a heavy paste which is later introduced into a paint mill in order to disperse it. Liquids have to be added, which are the vehicle of the finished paint and further pigments are added to the paste to render it a complete antifouling product. After the materials in the mill are thoroughly ground, the balance of the solvents and the varnishes, or "vehicle", are added in order to produce a workable paint of the proper consistency for customer use.

The pigments which are added consist mainly of cuprous oxides. It further appears that some inert pigments, such as talc or red iron oxide, which do not contribute to the antifouling properties, are also added, together with some antisettling agents to prevent the material from caking on storage.

The liquid ingredients added consist of a limed resin, together with solvents and mineral spirits. The limed resin has the function of breaking down in sea water or in fresh water to allow the active ingredients in the paint to leach out into the water and form an extremely thin liquid layer which discourages the attachment of marine growth. The merchandise as imported does not have any use or immediate application other than for further processing and manufacture. Plaintiffs' witness testified that he had seen the end product applied on ocean-going, as well as local fishing fleet type vessels, largely by means of a brush.

On cross-examination, Mr. Paterson testified that the liquid contained in the merchandise as imported, is not sufficient to produce a paint. Between 30 to 55 percent by weight of the finished paint may be the cuprous oxide, none of which is in the imported material but which is added after importation. The limed resin material which is added to the imported merchandise may be 30 to 40 percent by weight of the finished paint. Iron oxide is sometimes added for color and to give body to the paint. The imported merchandise does not contain a pigment in its imported condition. Mercury is added to the paste to discourage weed growth on the ship bottom. Plaintiffs' witness agreed that the involved merchandise is not a paint in its condition as imported (R. 8–10).

Mr. Paterson further testified that it was his understanding that all of the ingredients in the product may contribute to the antifouling property. He stated that the antifouling agents operate to discourage and deter marine life from attaching itself to the ship and, also, that as part of their operation they kill marine life. On redirect examination, the witness stated that he had not seen antifouling paint kill marine life.

Plaintiffs' next witness was Mr. Albert J. Sehorn, executive vice-

president of International Paint Company. He testified that he had general administrative duties and was in charge of all sales production for the company, and that he had made sales throughout the 11 Western States, as well as in Alaska, Hawaii, the Philippine Islands, Korea, and Japan. He had sold all types of marine paint, including antifouling paints, and has also observed, assisted and given technical advice as to how to apply antifouling paints. The witness stated that the main purpose of applying such paint to the bottom of a vessel is to keep it from slowing down, by keeping off marine growth. Mr. Sehorn disagreed with plaintiffs' witness Paterson that the ingredients of antifouling paste paint actually kill marine growth and stated that, in his opinion, the principal use of such ingredients is to deter the growth of marine life and keep it off the ship.

On cross-examination, Mr. Sehorn, who stated that he was not a chemist, testified that he was unable to say whether when barnacles or other marine life are attached to the bottom of a ship, they are there because antifouling paint does not kill, or whether they are there because the paint has lost its efficacy through the passage of time (R. 18). The witness did not sell the product, as imported, as paint.

On redirect examination, Mr. Sehorn testified that the paint also serves as a protection for the steel itself and that to a degree the product performs all the functions of a regular paint when applied to a vessel bottom.

Upon being recalled, plaintiffs' witness, Paterson, testified that exhibit 1 does not have any use other than for manufacture into paint. He further stated that the imported product cannot be applied in its imported condition as a paint. The witness testified that, in his opinion, the material contained in exhibit 1 was not a finished chemical product because it is far too heavy in consistency to be used as a paint and because its drying characteristics would make it quite unsatisfactory for such use. Plaintiffs' witness stated, however, that he had never made chemical analyses of the material contained in exhibit 1.

It is well settled that the protestant has the twofold burden of proof to show by substantial evidence not only that the classification here made is incorrect but also to establish the classification of the merchandise in issue which is claimed to be proper. *Novelty Import Co., Inc.* v. *United States*, 53 CCPA 28, C.A.D. 872 (1966). In our opinion, the involved merchandise is not properly classifiable under item 474.30 of the tariff schedules as paints not containing titanium pigments. Headnote 2 of subpart C, part 9, schedule 4, states as follows:

> 2. The term "paints and enamel paints" in this subpart covers dispersions of pigments or pigment-like materials with a liquid

(vehicle) which are suitable for application to surfaces as a thin layer, and which dry (harden) to an opaque, solid film. The vehicle of paints consists of drying oils or resins which bind the pigment particles together in the film; and the vehicle of enamel paints is principally varnish. Paints and enamel paints may also contain thinners, driers, plasticizers, or other agents.

A pigment is a basic material for the making of paints. *In the Matter of Pomeroy & Fischer*, 22 Treas. Dec. 197, T.D. 32243 (1912). Plaintiffs' witness, Paterson, testified to the effect that the merchandise at bar in its condition as imported does not contain a pigment. He further stated that while there is a liquid present in the merchandise as imported, the liquid is not sufficient to produce a paint and that there is no vehicle present in the merchandise as imported sufficient to enable the merchandise to be used as a paint. Accordingly, the witness agreed that the involved product is not a paint in its condition as imported. It further appears from the testimony of plaintiffs' witness, Sehorn, that the merchandise as imported is not sold as a paint. Counsel for the plaintiffs, in response to a question by Judge Wilson, conceded that the product requires further processing after importation before it has any use as a paint (R.25).

Plaintiffs in support of their claim direct our attention to the holding of this court in *Border Brokerage Company, Inc.* v. *United States*, 56 Cust. Ct. 16, C.D. 2606 (1965). There, certain merchandise described as "N429 Navaho Paint", which in its imported condition was suitable for use as a stain or paint for a protective covering after the addition of a thinner, was held properly classifiable under paragraph 66 of the Tariff Act of 1930, as modified, under the provision therein for "Pigments, colors, stains, and paints * * * not specially provided for * * * Other". It appears that the involved item was in the form of a paste when exported and had to be further treated by the addition of a thinner before it could be used as a stain or paint. The court therein held that the mere addition of the solvent to the product which, after importation possessed the characteristics rendering it fit for use as a stain on shingles, fixed its classification prior to importation as a stain. The situation in the *Border Brokerage* case, *supra*, is different, in our opinion, from that which obtains in the case at bar, and the cited case, is accordingly, distinguishable. In the present case, it appears that much more was required to change the condition of the imported paste material into that of a paint than merely adding a solvent or thinner. As disclosed by the record, the pigments which are added consist mainly of cuprous oxides, together with some inert pigments, such as talc or red iron oxide. The liquid solvents added to the imported material consist essentially of a limed resin, together with solvents and mineral spirits.

Plaintiffs in their brief (page 13) maintain that the merchandise in its imported condition is a complete paint, although not a complete antifouling paint, except for the addition of a thinner or vehicle (limed resin). However, as heretofore indicated, cuprous oxide and other matter are added to the imported paste to render it an antifouling product. Plaintiffs further contend that the merchandise in its imported condition is an unfinished paint and that it is properly dutiable under item 474.30 by virtue of General Interpretative Rule 10(h), *supra*. In our opinion, this contention of the plaintiffs is without merit.

In support of its claim that the imported paste is properly classifiable under item 474.30 as a "paint", plaintiffs cite *International Paint Co., Inc.* v. *United States*, 18 Cust. Ct. 105, C.D. 1052 (1947), affirmed in *United States* v. *International Paint Co., Inc.*, 35 CCPA 87, C.A.D. 376 (1948). There, the merchandise as imported consisted of "paint in paste form", containing copper and copper compounds, and certain impurities which rendered the imported product unfit for use as an antifouling paint. The processes to which the imported paint was subject in this country were to remove the impurities and make the product capable of use as an antifouling paint. It thus appears that in the case above cited, the merchandise already contained pigments in its imported condition which is not the situation in the case before us. Further, in the cited case, the question involved the applicability of drawback to the merchandise there imported and the question as to whether or not it was a paint, was not in issue. In the case at bar, the testimonial record discloses that the imported paste is not a "paint", and that the merchandise is not suitable for use as a paint unless and until further ingredients are added. The case of *Aceto Chemical Co., Inc.* v. *United States*, 59 Cust. Ct. 15, C.D. 3058, 271 F. Supp. 293 (1967), now before this division on rehearing, is not applicable in the case at bar. The court there held in effect that:

> Where a detergent cleaning liquid fit only for use as a cleansing agent when imported is diluted before use, or additives, not in any way affecting the use of the merchandise as a cleaning agent, are added, the general rule that merchandise must be classified as imported is not violated.

In the present case, however, we reiterate that the merchandise as imported is not a paint and the product cannot be used as an antifouling paint until certain essential ingredients are added.

Plaintiffs contend that the imported merchandise is more specifically provided for under the *eo nomine* provision for paints in item 474.30, in part 9, schedule 4, than under the "basket" provision for mixtures in item 403.90 under part 1, *supra*.

Assuming that the imported material was a paint, the general headnotes under schedule 4 of the tariff schedules support the classification here made. The involved merchandise is not within the exceptions to the headnote in part 9, schedule 4 of the tariff schedules. It thus appears that headnote 1 of schedule 4, part 1, and headnote 1 to part 9 of said schedules, indicate an intention to include mixtures in whole or in part of the products therein named under the above specific instructions for inclusion in part 1, schedule 4 even if more specifically described elsewhere in the schedule. The material here under consideration contains 30.74 percent anthracene oil (defendant's exhibit A). Anthracene is provided for in item 403.02 of the tariff schedules under subpart B, part 1, schedule 4, and, in our opinion, the imported merchandise is properly dutiable under item 403.90 of the tariff schedules as a mixture in whole or in part of any of the products provided for in subpart B, part 1 of schedule 4 of said schedules, as classified.

Plaintiffs also contend that the imported merchandise is not properly dutiable under item 409.00, *supra*, as alternatively claimed by the Government, for the reason that the merchandise, in its imported condition, is not a pesticide. Plaintiffs specifically contend that the merchandise would not be dutiable under item 409.00, *supra*, because it is not a finished product. We are of opinion that while the involved merchandise is not a finished "paint", it is a finished organic chemical product. However, we are persuaded that the Government's claim under item 409.00 of the tariff schedules has not been established. The presumption of correctness attaching to the classification of merchandise applies only to that fixed by the classifying officer. *Bowman Farm Dairy, Inc., et al.* v. *United States,* 33 Cust. Ct. 321, Abstract 58270 (1954). Accordingly, the defendant herein has the burden of proving that the imported merchandise is properly classifiable under item 409.00 as a mixture in whole or in part of any of the products provided for in subpart C, part 1, schedule 4 of the tariff schedules by virtue of item 405.15 for "Pesticides". The record in this case establishes that the primary purpose of the antifouling paint is to discourage and deter marine life from attaching itself to a ship. It has not been established that the imported paste containing 40 percent phenarsazine chloride is chiefly used as a "pesticide". No evidence was offered by the defendant sufficiently probative to establish its alternative claim. Accordingly, the defendant has failed in its burden of proof with respect to its alternative claim.

For all of the reasons heretofore advanced, we hold the involved merchandise properly dutiable under item 403.90 of the Tariff Schedules of the United States as a mixture in whole or in part of any of

the products provided for in subpart B, part 1, schedule 4 of said schedules, as classified.

The protest is overruled. Judgment will issue accordingly.